# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MIDDLEBROOK PHARMACEUTICALS, INC.,[1] | ) Case No. 10-11485 ( ) |
| | ) |
| | ) |
| | ) |
| _____ Debtor. _____ | ) |

## DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS UNDER SECTIONS 105(a) AND 366 OF THE BANKRUPTCY CODE (I) PROHIBITING UTILITY PROVIDERS FROM ALTERING, REFUSING, OR DISCONTINUING UTILITY SERVICES, (II) DEEMING UTILITY PROVIDERS ADEQUATELY ASSURED OF FUTURE PERFORMANCE, AND (III) ESTABLISHING PROCEDURES FOR DETERMINING ADEQUATE ASSURANCE OF PAYMENT

MiddleBrook Pharmaceuticals, Inc., the above-captioned debtor and debtor in possession (the "**Debtor**"), files this *Motion for Interim and Final Orders Under Section 366 of the Bankruptcy Code (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment* (the "**Motion**"). In support of the Motion, the Debtor respectfully shows as follows:

## I. GENERAL BACKGROUND

1. On April 30, 2010 (the "**Petition Date**"), the Debtor commenced a voluntary case (the "**Bankruptcy Case**") under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"). Sections 1107(a) and 1108 of the Bankruptcy Code authorize the Debtor to operate its business and manage its properties and assets as a debtor in possession.

2. The United States Trustee for the District of Delaware (the "**United States Trustee**") has not yet appointed an official committee in this case under Section 1102 of the

---

[1] The last four digits of the Debtor's taxpayer identification number are 8264. The Debtor's mailing address is 7 Village Circle, Suite 100, Westlake, Texas 76262.

Bankruptcy Code, and no party in interest has requested the appointment of a trustee or examiner.

### A. The Debtor's Business

#### i. Overview

3. The Debtor, which began operations in 2000, is a pharmaceutical company focused on commercializing anti-infective drug products that fulfill unmet medical needs.

4. The Debtor has developed a proprietary delivery technology called PULSYS®, which enables the delivery of certain drugs in rapid bursts (known in the pharmaceutical industry as a pulsatile delivery). The Debtor's PULSYS® technology is protected by 25 U.S.-issued patents and seven foreign patents, which extend through 2020. The Debtor currently markets one drug product using its PULSYS® technology—MOXATAG Tablets, 775 mg, the first and only FDA-approved, once-daily amoxicillin.

5. In addition to MOXATAG, the Debtor markets three other drug products that do not use the PULSYS® technology, KEFLEX 250, 500, and 750 mg. KEFLEX is an immediate-release brand name drug product containing the active pharmaceutical ingredient cephalexin, an antibiotic used to treat bacterial infections.

6. The Debtor also has two additional product candidates in clinical development that use the PULSYS® platform technology: a PULSYS® version of KEFLEX and a pediatric amoxicillin sprinkle PULSYS®, which can be sprinkled over food (in multiparticulate granules).

#### ii. Events Leading to Chapter 11

7. The Debtor derives all of its sales from within the United States. The degree of market acceptance for the Debtor's current products and any pharmaceutical product that the Debtor may develop depends on a number of factors, including: (1) demonstration of clinical

DB02:9573205.1      069407.1001

efficacy and safety; (2) cost effectiveness; (3) potential advantages over competitive products and alternative therapies, including generics; (4) reimbursement policies of government and third-party payors; and (5) pharmacist substitution. The Debtor's products have not yet gained wide market acceptance among physicians, patients, pharmacists, healthcare payors, and the medical community.

8.    Further, the process of developing and commercializing the Debtor's products requires significant research and development, preclinical testing and clinical trials, as well as regulatory approvals, significant marketing and sales efforts, and manufacturing capabilities. Although the Debtor launched its KEFLEX 750 mg product in July 2006 and its MOXATAG product in March 2009, after significant capital investment, sales have been considerably lower than the Debtor's expectations. The Debtor previously anticipated that its products would generate revenues in excess of expenses and would contribute additional cash flow to help fund its other operations, including further research and development efforts. But the Debtor now expects that the commercialization and marketing activities for its current MOXATAG and KEFLEX products, together with its general and administrative expenses, will continue to cause significant operating losses in 2010.

9.    Moreover, the United States' economy has had a significant impact on the Debtor's ability to generate income. The overall economic conditions affecting the Debtor's customers, including one of the worst recessions in decades, high unemployment, low consumer confidence, high consumer debt levels, increasing numbers of the U.S. population without health insurance, and low availability of consumer credit, have likely affected the ability or willingness of consumers to purchase the Debtor's products. Unlike competing generic products, the underlying technology in the Debtor's products offer the convenience of reduced dosing and

DB02:9573205.1          069407.1001

reduced quantities of active pharmaceutical ingredients, without a corresponding reduction in efficacy; thus, the Debtor's products are generally more expensive for consumers than competing generic brands, even though the generic products require more frequent daily dosing and higher amounts of active pharmaceutical ingredients. In the current economy, consumers have been reluctant to accept higher costs.

10. Because of research and other capital costs, competition, lack of market acceptance, and a depressed consumer market, all of which resulted in lower than expected sales, the Debtor's net revenues were $14.8 million, $8.8 million, and $10.5 million for the fiscal years ended December 31, 2009, 2008, and 2007, respectively. The Debtor's net losses were $62.3 million, $41.6 million, and $42.2 million for the fiscal years ended December 31, 2009, 2008 and 2007, respectively. As of December 31, 2009, the Debtor has incurred losses of approximately $299.2 million.

11. To preserve its financial resources, in September 2009 and December 2009, the Debtor implemented a work force reduction. In the first round of its work force reduction, the Debtor eliminated approximately 25% of its sales representatives and managers and 20% of its corporate staff. In the second round, the Debtor eliminated approximately 33% of its sales representatives and managers and 20% of its corporate staff. In addition, effective March 15, 2010, the Debtor implemented a third round of work force reductions wherein it eliminated its field sales force and significantly reduced its corporate staff to preserve its cash resources. As part of this work force reduction, and to further reduce expenses, the Debtor's Chief Executive Officer announced his resignation as an officer and director, effective March 15, 2010. Consequently, the Debtor has terminated approximately 291 employees (the "**Terminated Employees**"). As of the Petition Date, the Debtor has 14 remaining employees, some of which

work at the Debtor's headquarters in Westlake, Texas and some of which work at the Debtor's offices in Gaithersburg, Maryland (the "**Remaining Employees**"). All the Remaining Employees are salaried.

12.     In a further effort to preserve its financial resources, in January 2010, the Debtor vacated all its leased premises in Germantown, Maryland. The Debtor also attempted to reach an agreement with its Maryland landlord to settle its obligations under the Maryland leases, but the parties have been unable to do so. Consequently, on April 1, 2010, the Debtor did not make certain payments provided in or associated with the Maryland leases. Thereafter, the Debtor received a notice of default from the Maryland landlord. In addition to triggering certain rights under the Maryland leases, including the right to draw down on two letters of credit, the Maryland lease defaults give rise to potential claims relating to the Debtor's private placement of stock and its obligation to maintain an effective registration statement.

13.     Because of the significant unsecured debt and trade debt[2] incurred by the Debtor in developing, testing, marketing, and manufacturing its products, the lower than expected revenues generated by the Debtor's principal products, competition, lack of market acceptance, a depressed consumer market, the financial burden associated with its Maryland leases, and the potential shareholders claims relating to the Debtor's private placement of stock, the Debtor is exploring various alternatives to maximize the value of its businesses for the benefit of all stakeholders. Working with its counsel and financial advisors, the Debtor determined that commencing this case under Chapter 11 of the Bankruptcy Code provides the best avenue to preserve and maximize value for its estate.

---

[2]     The Debtor does not have any secured or other bank debt.

DB02:9573205.1          069407.1001

14.     Additional information and detail about the Debtor's business and the events leading to this Bankruptcy Case can be found in the *Declaration of David Becker, the Debtor's Executive Vice President, Chief Financial Officer, and Acting President and Chief Executive Officer of MiddleBrook Pharmaceuticals, Inc., in Support of Chapter 11 Petition and First Day Motions*, filed contemporaneously herewith and is incorporated herein by reference.

## B.     Facts Supporting Requested Relief

15.     In the normal course of its business, the Debtor obtains utility services from several utility providers (the "**Utility Providers**"), including telephone, Internet, and other telecommunications services (the "**Utility Services**"). The Utility Providers are set forth on the list attached hereto as Exhibit A.[3]

16.     The Debtor depends on the constant, reliable provision of Utility Services. Should the Utility Providers refuse or discontinue service, even for a brief period, the Debtor's business operations would be severely disrupted.

17.     Other than the current utility bills, which are not yet due as of the Petition Date and which the Debtor cannot pay because of the commencement of this Bankruptcy Case, the Debtor historically has paid its undisputed utility bills in full when due.

18.     Other utility obligations, including power, sewage, gas, and water, are either (i) obligations of the Debtor's respective landlords or (ii) obligations arising under nonresidential real property leases, for which the Debtor has filed a motion to reject contemporaneously herewith under Section 365 of the Bankruptcy Code. As such, those utilities are not the subject of this Motion, and a Utility Deposit (defined below) will not be set aside for those utilities.

---

[3]     The Debtor reserves the right to argue that any entities now or hereafter listed on Exhibit A are not "utilities" under Section 366 of the Bankruptcy Code. Further, the Debtor intends the term "Utility Providers" to include all the Debtor's utility providers whether or not listed on Exhibit A. The Debtor believes that Exhibit A is complete but recognizes that there may be inadvertent omissions.

## II.  JURISDICTION AND VENUE

19.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief requested herein are Sections 105(a) and 366 of the Bankruptcy Code.

## III.  REQUEST FOR RELIEF

20.    By this Motion, the Debtor requests that the Court enter the Interim Order, attached hereto as Exhibit B, and the Final Order, attached hereto as Exhibit C:  (i) prohibiting the Utility Providers from altering, refusing, or discontinuing Utility Services on account of prepetition invoices, including the making of demands for security deposits or accelerated payment terms; (ii) providing that the Utility Providers have "adequate assurance of payment" within the meaning of Section 366 of the Bankruptcy Code, based on, among other things, the Debtor's establishment of a segregated account containing an amount equal to fifty percent of the Debtor's estimated monthly Utility Service costs,[4] which may be adjusted by the Debtor if the Debtor terminates any Utility Service, makes other arrangements regarding adequate assurance of payment, or determines that an entity listed on Exhibit A to this Motion is not a utility under Section 366 of the Bankruptcy Code; and (iii) establishing procedures under Section 105(a) of the Bankruptcy Code for determining additional adequate assurance of future payment and authorizing the Debtor to provide adequate assurance of future payment to the Debtor's Utility Providers.

---

[4]    *See* Exhibit A for the respective Utility Deposit for each Utility Provider.

DB02:9573205.1          069407.1001

## IV.    BASIS FOR RELIEF REQUESTED

21.    If the Utility Providers are permitted to terminate the Utility Services, the Debtor could suffer a serious (and potentially irreparable) disruption in its business operations, as well as a loss of revenue and profits. Such a disruption would have a negative impact on the Debtor's ability to successfully implement its restructuring strategy. Section 366 of the Bankruptcy Code provides that in a Chapter 11 case, during the initial thirty days after the Petition Date, utilities may not alter, refuse, or discontinue service to, or discriminate against, a debtor solely because of the commencement of its Chapter 11 case or the existence of prepetition debts owed by the debtor. *See* 11 U.S.C. § 366. In a Chapter 11 case, following the thirty-day period under Section 366(c) of the Bankruptcy Code, utilities may discontinue service to the debtor if the debtor fails to provide adequate assurance of future performance of its postpetition obligations in a form that is satisfactory to the utility, subject to the Court's ability to modify the amount of adequate assurance.

22.    Section 366(c)(1) of the Bankruptcy Code provides that "assurance of payment" may consist of:  (i) a cash deposit; (ii) a letter of credit; (iii) a certificate of deposit; (iv) a surety bond; (v) a prepayment of utility consumption; or (vi) another form of security mutually agreed on between the utility and the debtor or the trustee. *See* 11 U.S.C. § 366(c)(1). Although the form of adequate assurance of payment may be limited to the types of security enumerated in Section 366(c)(1)(A) of the Bankruptcy Code, the determination of the amount of adequate assurance is within the Court's discretion. *In re Adelphia Bus. Solutions, Inc.*, 280 B.R. 63, 81 (Bankr. S.D.N.Y. 2002). Moreover, the requirement that a utility receive adequate assurance of payment does not require a guarantee of payment; instead, Section 366 of the Bankruptcy Code was enacted to avoid exposing a utility to an *unreasonable* risk of nonpayment. *Id.* at 80.

- 8 -

23.    To provide adequate assurance of payment for future services to the Utility Providers, the Debtor proposes to deposit a sum equal to fifty percent of the Debtor's estimated monthly Utility Service costs (calculated based on a "rolling" 12-month average) into an interest-bearing, newly created, segregated account on or before thirty days after the Petition Date (the "**Utility Deposit**"). The Debtor submits that the Utility Deposit constitutes sufficient adequate assurance to the Utility Providers. *See* 11 U.S.C. § 366(c)(1)(A)(i).   If any Utility Provider believes additional adequate assurance is required, it may request such additional assurance under the procedures set forth below.

24.    For purposes of the Final Order, but not Interim Order, the Debtor proposes to establish certain procedures (the "**Utility Procedures**") under which a Utility Provider may request additional adequate assurance of payment if the Utility Provider can demonstrate that additional adequate assurance is warranted.   The Utility Procedures, which the Debtor seeks to implement, are as follows:

  a.    If a Utility Provider is unsatisfied with the assurance of future payment provided by the Debtor, the Utility Provider must serve a written request (a "**Request**") upon proposed counsel to the Debtor, Alston & Bird, LLP, 1201 W. Peachtree Street, Atlanta, Georgia 30309, Attn: Matthew Levin and Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 17th Floor, Wilmington, Delaware 19801, Attn: Kenneth J. Enos, setting forth (i) the location(s) for which Utility Services are provided, (ii) the account number(s) for such location(s), (iii) the outstanding balance for each account, (iv) a summary of the Debtor's payment history on each account, including any security deposits, and (v) an explanation of why the Utility Deposit is not adequate assurance of payment.

  b.    Without further Court order, the Debtor may enter into an agreement granting additional adequate assurance to a Utility Provider after receiving a Request, if the Debtor, in its discretion, determines that the Request is reasonable.

  c.    If the Debtor finds the Request unreasonable, the Debtor shall, within twenty days after receipt of the Request, file a motion (the "**Determination Motion**") pursuant to Section 366(c)(3) of the Bankruptcy Code, seeking a determination from the Court that the Utility

- 9 -

Deposit, plus any additional consideration offered by the Debtor, constitutes adequate assurance of payment. Pending notice and a hearing on the Determination Motion, the Utility Provider that is the subject of the unresolved Request may not alter, refuse, or discontinue services to the Debtor.

d.    The Utility Deposit shall be deemed adequate assurance of payment unless and until a future order of the Court is entered requiring further assurance of payment.

25.    The Debtor also requests that a final hearing on this Motion be held within twenty-five days of the Petition Date to ensure that, if a Utility Provider contends that it can unilaterally refuse service to the Debtor on the 31st day after the Petition Date, the Debtor will have the opportunity, to the extent necessary, to request that the Court make such modifications to the Utility Procedures in time to avoid any potential termination of Utility Service.

26.    Upon information and belief, there are no material defaults or arrearages regarding undisputed invoices for Utility Services, other than payment interruptions which may result from the commencement of this Bankruptcy Case.

27.    The Debtor's proposed method of furnishing adequate assurance of payment for postpetition Utility Services is in the best interest of the Debtor's estates. This Court has granted relief similar to that requested herein following the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. *See, e.g., In re AFY Holding Company*, Case No. 08-12175 (Bankr. D. Del. Oct. 14, 2008) (Walsh, J.) (deeming utilities adequately assured where the debtors established a segregated account containing an amount equal to fifty percent (50%) of the debtors' estimated monthly cost of utility service); *In re ProxyMed Transaction Services, Inc.*, Case No. 08-11551 (Bankr. D. Del. Aug. 18, 2008) (Shannon, J.) (same); *In re National Dry Cleaners Inc.*, Case No. 08-11382 (Bankr. D. Del. July 7, 2008) (Sontchi, J.) (same); *In re Distributed Energy Systems Corp.*, Case No. 08-11101 (Bankr. D. Del. June 25, 2008) (Gross, J.) (same); *In re Buffets Holdings, Inc.*, Case No. 08-10141 (Bankr. D. Del. Feb.

DB02:9573205.1          069407.1001

27, 2008) (Walrath, J.) (same); *In re New Century TRS Holdings, Inc.*, No. 07-10416 (Bankr. D. Del. Apr. 24, 2007) (Carey, J.) (deeming utilities adequately assured where debtor provided two-weeks deposit for utilities).

28.     Because uninterrupted Utility Service is vital to the Debtor's continued business operations and, consequently, to the success of its Bankruptcy Case, the relief requested herein is necessary and in the best interests of the Debtor, its estate, and creditors.  Such relief ensures that the Debtor's business operations will not be disrupted and provides Utility Providers and the Debtor with an orderly and fair procedure for determining "adequate assurance."

29.     Based upon the foregoing, the Debtor submits that the relief requested herein should be granted.

## V.     WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

30.     As set forth throughout this Motion, any delay in authorizing the relief requested herein would be detrimental to the Debtor, its estate, and its creditors.  Indeed, the Debtor's ability to manage and run its business operations with as little disruption as possible requires the continuous provision of the Utility Services.  Accordingly, to implement the foregoing, the Debtor seeks a waiver of the stay of the order authorizing the use, sale, or lease of property of the estate under Bankruptcy Rule 6004(h), if that provision is applicable to any order approving this Motion.

DB02:9573205.1          069407.1001

## VI.    NOTICE

31.    No trustee, examiner, or creditors' committee has been appointed in this Bankruptcy Case. The Debtor has served notice of this Motion on (a) the United States Trustee; (b) those creditors holding the thirty (30) largest unsecured claims; (c) the Internal Revenue Service; and (d) all parties that requested notice pursuant to Local Rule 2002-1(b). The Debtor submits that no other or further notice need be provided.

## VII.    CONCLUSION

WHEREFORE, the Debtor requests entry of the Interim Order, attached hereto as Exhibit B, and the Final Order, attached hereto as Exhibit C, granting the relief requested herein and such other and further relief as is just and proper.

DATED:  April 30, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____

Joel A. Waite (No. 2925)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19801-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

Matthew W. Levin
David A. Wender
Sage M. Sigler
Jonathan T. Edwards
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia  30309-3424
Telephone:  (404) 881-7000
Facsimile:  (404) 881-7777

Proposed Attorneys for the Debtor

- 12 -

# EXHIBIT A

## [LIST OF UTILITY PROVIDERS]

## LIST OF UTILITY PROVIDERS AND UTILITY DEPOSIT AMOUNT

| UTILITY COMPANY | ACCOUNT NUMBER(s) | UTILITY/SERVICE TYPE | ADDRESS | UTILITY DEPOSIT AMOUNT[1] |
|---|---|---|---|---|
| AT&T | 836833917 | Blackberry – Cell Phone | AT&T 17000 Cantrell Rd., Little Rock, AR 72223 | $3,035.00 |
| Verizon Wireless | 420589494-00001 | Blackberry – Cell Phone/Air Card | Verizon Wireless 20 Alexander Drive, Wallingford, CT 06492 *and* Verizon Wireless Attn: Bankruptcy Administration P.O. Box 3397 Bloomington, IL 61702 | $1,375.00 |
| AT&T | 0305194350001 | Toll Free "800" Numbers | AT&T Return Mail Center, Attn: Tim Breiding PO Box 16740, Mesa, AZ 85201 *and* AT&T PO Box 5001, Carol Stream, IL 60197 | $3,867.50[2] |
| AT&T | 8174909174 | Multiple POTS Lines for Westlake | AT&T Return Mail Center, Attn: Tim Breiding PO Box 16740, Mesa, AZ 85201 *and* AT&T PO Box 5001, Carol Stream, IL 60197 | See FN 3 |

[1] The Utility Deposit amount is based on the average monthly amount per Utility Provider (on a 12-month rolling basis) multiplied by 50%.
[2] This amount is 50% of $7,735.00, which is the 12-month average for AT&T Account Nos. 0305194350001, 8174909174, 8174908790, and 8310001262167.

| | | | | |
|---|---|---|---|---|
| AT&T | 8174908790 | POTS Line for Westlake Fax Machine | AT&T Return Mail Center, Attn: Tim Breiding PO Box 16740, Mesa, AZ 85201 *and* AT&T PO Box 5001, Carol Stream, IL 60197 | See FN 3 |
| AT&T | 8178371200 | TX Long Distance | AT&T Return Mail Center, Attn: Tim Breiding PO Box 16740, Mesa, AZ 85201 *and* AT&T PO Box 5001, Carol Stream, IL 60197 | See FN 3 |
| AT&T | 8310001262167 | TX - T1 Internet Data Lines | AT&T Return Mail Center, Attn: Tim Breiding PO Box 16740, Mesa, AZ 85201 *and* AT&T PO Box 5001, Carol Stream, IL 60197 | See FN 3 |
| Verizon Business | 9150188144X25 | Toll Free "800" Number (Medical Information Line) | Verizon Wireless Attn: Bankruptcy Administration PO Box 3037 Bloomington, IL 61702 *and* Verizon Wireless 500 2nd Avenue SE, Cedar Rapids, IA 52401 | $1,365.50[3] |

---

[3] This amount is 50% of $2,731.00, which is the 12-month average for Account Nos. 9150188144X25 and 00007570336003Y.

| | | | | |
|---|---|---|---|---|
| Verizon Business | 00007570336003Y | POTS Lines for Germantown | Verizon Wireless Attn: Bankruptcy Administration PO Box 3037 Bloomington, IL 61702 *and* Verizon Wireless 500 2nd Avenue SE, Cedar Rapids, IA 52401 | See FN 4 |
| eFAX | | Electronic Fax Numbers | eFAX 6922 Hollywood Blvd., 5th floor Los Angeles, CA 90028 | $24.95 |
| | | | **TOTAL DEPOSIT** | $9,667.95 |

DB02:9573228.1     069407.1001

# EXHIBIT B

**[PROPOSED INTERIM ORDER]**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MIDDLEBROOK PHARMACEUTICALS, INC.,[1] | ) Case No. 10-11485 ( ) |
| | ) |
| | ) |
| Debtor. | ) Ref. Docket No. _____ |

**INTERIM ORDER PURSUANT TO SECTIONS 366 AND 105(A) OF THE BANKRUPTCYCODE (I) PROHIBITING UTILITY PROVIDERS FROM ALTERING, REFUSING, OR DISCONTINUING UTILITY SERVICES, (II) DEEMING UTILITIES COMPANIES ADEQUATELY ASSURED OF FUTURE PERFORMANCE, AND (III) ESTABLISHING PROCEDURES FOR DETERMINING ADEQUATE ASSURANCE OF PAYMENT**

Upon consideration of the *Motion for Interim and Final Orders Under Section 366 of the Bankruptcy Code (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment* (the "**Motion**")[2] filed by MiddleBrook Pharmaceuticals, Inc., the above-captioned debtor and debtor in possession (the "**Debtor**"); and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and due notice of the Motion having been provided; and it appearing that no other or further notice of the Motion need be provided; and upon the *Declaration of David Becker, the Debtor's Executive Vice President, Chief Financial Officer, and Acting President and Chief Executive Officer of MiddleBrook Pharmaceuticals, Inc., in Support of Chapter 11 Petition and First Day Motions*; and the Court having determined

---

[1]     The last four digits of the Debtor's taxpayer identification number are 8264. The Debtor's mailing address is 7 Village Circle, Suite 100, Westlake, Texas 76262.

[2]     Capitalized terms not otherwise defined herein shall have the meaning accorded to them as set forth in the Motion.

that the relief sought in the Motion is in the best interests of the Debtor, its estate, and creditors and other parties in interest; and all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED on an interim basis.

2.      The Debtor is authorized, but not directed, to pay on a timely basis and in accordance with its prepetition practices all undisputed invoices for postpetition Utility Services provided by the Utility Providers.

3.      To the extent not already deposited, the Debtor shall, on or before 20 days after the Petition Date, deposit a sum equal to fifty percent of the Debtor's estimated average monthly cost of Utility Service (the "**Utility Deposit**") for each Utility Provider, in the aggregate approximate amount of $9,667.95, into a newly created segregated account (the "**Utility Deposit Account**"), with such Utility Deposit to be held in escrow, for the purpose of providing each Utility Provider adequate assurance of payment of its postpetition Utility Services to the Debtor.

4.      Pending the final hearing on the Motion, the Utility Providers are prohibited from altering, refusing, or discontinuing Utility Services because of the commencement of the Debtor's Chapter 11 case or because of any unpaid prepetition invoices or charges for Utility Services.

5.      The Debtor shall serve a copy of the Motion and the proposed Final Order, which includes the proposed procedures, on each Utility Provider within three business days after entry of this Order by the Court.

6.      The Utility Deposit shall be deemed adequate assurance of payment unless and until a future order of the Court is entered requiring further assurance of payment.

7.     Notwithstanding the possible applicability of Rule 6004(h) of the Bankruptcy Rules, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

8.     A final hearing will be held on _____, 2010, at ____:00 ___.M.     (EST). The deadline by which any objection to the Final Order must be filed and served on counsel is __ _____, 2010, at ____:00 ___.M. (EST).  If no objections are filed to the Final Order, the Court may enter the Final Order without further notice or hearing.

9.     This Court shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order.

Wilmington, Delaware
May ___, 2010

_____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT C

**[PROPOSED FINAL ORDER]**