| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MIDDLEBROOK PHARMACEUTICALS, INC.,[1] | ) ) | Case No. 10-11485 (MFW) |
| | ) | **Hearing Date: June 7, 2010 at 9:30 a.m. (ET)** |
| | ) | **Objection Deadline: June 1, 2010 at 4:00 p.m. (ET)** |
| Debtor. | ) | |

**MOTION PURSUANT TO SECTIONS 105(a), 363, AND 365 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, 6006, AND 9014, AND LOCAL RULES 2002-1 AND 6004-1, REQUESTING ENTRY OF (I) THE BIDDING PROCEDURES ORDER (a) APPROVING THE BIDDING PROCEDURES, (b) SCHEDULING AN AUCTION, (c) APPROVING THE BREAK-UP FEE, (d) SCHEDULING A FINAL SALE HEARING, AND (e) APPROVING THE FORM AND MANNER OF NOTICE OF AUCTION AND SALE AND NOTICE OF ASSUMPTION AND ASSIGNMENT OF CONTRACTS; AND (II) THE SALE ORDER APPROVING THE SALE OF ASSETS, INCLUDING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS, FREE AND CLEAR OF ALL LIENS, CLAIMS, AND INTERESTS**

MiddleBrook Pharmaceuticals, Inc., the above-captioned debtor and debtor in possession (the "**Debtor**"), files this *Motion Pursuant to Sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rules 2002-1 and 6004-1, Requesting Entry of (I) the Bidding Procedures Order (a) Approving the Bidding Procedures, (b) Scheduling an Auction, (c) Approving the Break-up Fee, (d) Scheduling a Final Sale Hearing, and (e) Approving the Form and Manner of Notice of Auction and Sale and Notice of Assumption and Assignment of Contracts; and (II) the Sale Order Approving the Sale of Assets, Including the Assumption and Assignment of Contracts, Free and Clear of All Liens, Claims, and Interests* (the "**Motion**"). In support of this Motion, the Debtor respectfully shows as follows:

---

[1]     The last four digits of the Debtor's taxpayer identification number are 8264. The Debtor's mailing address is 7 Village Circle, Suite 100, Westlake, Texas 76262.

# I. GENERAL BACKGROUND

1. On April 30, 2010 (the "**Petition Date**"), the Debtor commenced a voluntary case (the "**Bankruptcy Case**") under Chapter 11, Title 11, United States Code (the "**Bankruptcy Code**"). Sections 1107(a) and 1108 of the Bankruptcy Code authorize the Debtor to operate its business and manage its properties and assets as a debtor in possession.

2. The United States Trustee for the District of Delaware (the "**United States Trustee**") appointed an official committee of creditors holding unsecured claims against the Debtor (the "**Committee**") under Section 1102 of the Bankruptcy Code on May 11, 2010. No party in interest has requested the appointment of a trustee or examiner.

## A. The Debtor's Business

### 1. Overview

3. The Debtor, which began operations in 2000, is a pharmaceutical company focused on commercializing anti-infective drug products that fulfill unmet medical needs.

4. The Debtor has developed a proprietary delivery technology called PULSYS®, which enables the delivery of certain drugs in rapid bursts (known in the pharmaceutical industry as a pulsatile delivery). The Debtor's PULSYS® technology is protected by 25 U.S.-issued patents and seven foreign patents, which extend through 2020. The Debtor currently markets one drug product using its PULSYS® technology—MOXATAG® Tablets, 775 mg, the first and only FDA-approved, once-daily amoxicillin.

5. In addition to MOXATAG®, the Debtor markets three other drug products that do not use the PULSYS® technology, KEFLEX® 250, 500, and 750 mg. KEFLEX® is an immediate-release brand name drug product containing the active pharmaceutical ingredient cephalexin, an antibiotic used to treat bacterial infections.

6. The Debtor also has two additional product candidates in clinical development that use the PULSYS® platform technology: a PULSYS® version of KEFLEX® and a pediatric amoxicillin sprinkle PULSYS®, which can be sprinkled over food (in multiparticulate granules).

## 2. Events Leading to Chapter 11

7. The Debtor derives all of its sales from within the United States. The degree of market acceptance for the Debtor's current products and any pharmaceutical product that the Debtor may develop depends on a number of factors, including: (1) demonstration of clinical efficacy and safety; (2) cost effectiveness; (3) potential advantages over competitive products and alternative therapies, including generics; (4) reimbursement policies of government and third-party payors; and (5) pharmacist substitution. The Debtor's products have not yet gained wide market acceptance among physicians, patients, pharmacists, healthcare payors, and the medical community.

8. Further, the process of developing and commercializing the Debtor's products requires significant research and development, preclinical testing and clinical trials, as well as regulatory approvals, significant marketing and sales efforts, and manufacturing capabilities. Although the Debtor launched its KEFLEX® 750 mg product in July 2006 and its MOXATAG® product in March 2009, after significant capital investment, sales have been considerably lower than the Debtor's expectations. The Debtor previously anticipated that its products would generate revenues in excess of expenses and would contribute additional cash flow to help fund its other operations, including further research and development efforts. But the Debtor now expects that the commercialization and marketing activities for its current MOXATAG® and KEFLEX® products, together with its general and administrative expenses, will continue to cause significant operating losses in 2010.

9.     Moreover, the United States' economy has had a significant impact on the Debtor's ability to generate income. The overall economic conditions affecting the Debtor's customers, including one of the worst recessions in decades, high unemployment, low consumer confidence, high consumer debt levels, increasing numbers of the U.S. population without health insurance, and low availability of consumer credit, have likely affected the ability or willingness of consumers to purchase the Debtor's products. Unlike competing generic products, the underlying technology in the Debtor's products offer the convenience of reduced dosing and reduced quantities of active pharmaceutical ingredients, without a corresponding reduction in efficacy; thus, the Debtor's products are generally more expensive for consumers than competing generic brands, even though the generic products require more frequent daily dosing and higher amounts of active pharmaceutical ingredients. In the current economy, consumers have been reluctant to accept higher costs.

10.     Because of research and other capital costs, competition, lack of market acceptance, and a depressed consumer market, all of which resulted in lower than expected sales, the Debtor's net revenues were $14.8 million, $8.8 million, and $10.5 million for the fiscal years ended December 31, 2009, 2008, and 2007, respectively. The Debtor's net losses were $62.3 million, $41.6 million, and $42.2 million for the fiscal years ended December 31, 2009, 2008 and 2007, respectively. As of December 31, 2009, the Debtor has incurred losses of approximately $299.2 million.

11.     To preserve its financial resources, in September 2009 and December 2009, the Debtor implemented a work force reduction. In the first round of its work force reduction, the Debtor eliminated approximately 25% of its sales representatives and managers and 20% of its corporate staff. In the second round, the Debtor eliminated approximately 33% of its sales

representatives and managers and 20% of its corporate staff. In addition, effective March 15, 2010, the Debtor implemented a third round of work force reductions wherein it eliminated its field sales force and significantly reduced its corporate staff to preserve its cash resources. As part of this work force reduction, and to further reduce expenses, the Debtor's Chief Executive Officer announced his resignation as an officer and director, effective March 15, 2010. Consequently, the Debtor has terminated approximately 291 employees. As of the Petition Date, the Debtor has 14 remaining employees, some of which work at the Debtor's headquarters in Westlake, Texas and some of which work at the Debtor's offices in Gaithersburg, Maryland.

12.     In a further effort to preserve its financial resources, in January 2010, the Debtor vacated all its leased premises in Germantown, Maryland. The Debtor also attempted to reach an agreement with its Maryland landlord to settle its obligations under the Maryland leases, but the parties have been unable to do so. Consequently, on April 1, 2010, the Debtor did not make certain payments provided in or associated with the Maryland leases. Thereafter, the Debtor received a notice of default from the Maryland landlord. In addition to triggering certain rights under the Maryland leases, including the right to draw down on two letters of credit, the Maryland lease defaults give rise to potential claims relating to the Debtor's private placement of stock and its obligation to maintain an effective registration statement.

13.     Because of the significant unsecured debt and trade debt[2] incurred by the Debtor in developing, testing, marketing, and manufacturing its products, the lower than expected revenues generated by the Debtor's principal products, competition, lack of market acceptance, a depressed consumer market, the financial burden associated with its Maryland leases, and the

---

[2]     The Debtor does not have any secured or other bank debt.

potential shareholders claims relating to the Debtor's private placement of stock, the Debtor is exploring various alternatives to maximize the value of its businesses for the benefit of all stakeholders. Working with its counsel and financial advisors, the Debtor determined that commencing this case under Chapter 11 of the Bankruptcy Code provides the best avenue to preserve and maximize value for its estate.

14. Additional information and detail about the Debtor's business and the events leading to this Bankruptcy Case can be found in the *Declaration of David Becker, the Debtor's Executive Vice President, Chief Financial Officer, and Acting President and Chief Executive Officer of MiddleBrook Pharmaceuticals, Inc., in Support of Chapter 11 Petition and First Day Motions,* filed on April 30, 2010 [Docket No. 4], which is incorporated herein by reference.

**B.** **Facts Supporting Requested Relief**

15. In March 2010, the Debtor retained Gleacher & Company Securities, Inc. ("**Gleacher**") to serve as its financial advisor to provide financial advice in connection with the Debtor's attempts to complete a strategic restructuring, reorganization, and/or asset sale.

16. After its retention by the Debtor, Gleacher and the Debtor commenced a marketing process (the "**Marketing Process**") designed to identify potential acquirers and/or strategic partners and investors that could enable the Debtor to maximize value from the Debtor's assets for the benefit of all stakeholders.

17. As part of the Marketing Process, Gleacher and the Debtor first compiled a list of parties likely to be interested in the Debtor or its assets. From this list, Gleacher contacted approximately 120 entities that they believed would be interested in the Debtor's assets and business.

18. To facilitate diligence, Gleacher and the Debtor created an electronic data room (the "**Data Room**") whereby potential acquirers would have the opportunity and ability to review materials necessary to assess the Debtor's assets and business.

19. After the Debtor and Gleacher contacted potential acquirers to determine whether they would be interested in acquiring some or all of the Debtor's business and assets, Gleacher and the Debtor distributed an overview of the Debtors assets and business and a confidentiality and non-disclosure agreement to 75 entities that had expressed some level of interest in acquiring the Debtor and/or its assets.

20. In response to the materials distributed, the Debtor received eleven (11) executed confidentiality and non-disclosure agreements from potential acquirers.

21. Thereafter, on and after approximately March 15, 2010, Gleacher granted each party that executed the confidentiality and non-disclosure agreement access to the electronic data room that contained material information concerning the Debtor's assets and business. As of the Petition Date, eight (8) parties were actively engaged in performing diligence.

22. After the parties obtained access to the Debtor's electronic data room, the Debtor commenced advanced discussions with three (3) potential acquirers concerning their interest in acquiring some or all of the Debtor's assets and sought definitive offers.

23. Through these discussions, the Debtor and Gleacher concluded that the offer received from Victory Pharma, Inc. ("**Victory**," the "**Stalking Horse**," or the "**Purchaser**") represented the highest and best opportunity to maximize the value of the Debtor's assets and, thereafter, actively negotiated the terms of an asset purchase agreement.

24. As a result of the Marketing Process, discussions with potential acquirers and negotiations with Victory, on May 14, 2010, the Debtor and Victory entered into that certain

Asset Purchase Agreement (the "**APA**") with Victory through which Victory seeks to acquire substantially all of the assets of the Debtor for $17,100,000, plus the assumption of various liabilities of the Debtor as set forth in the APA (the "**Purchase Price**").

## II.     JURISDICTION AND VENUE

25.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief requested herein are Sections 105(a), 363, and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1 and 6004-1 of the Local Rules for the United States Bankruptcy Court, District of Delaware (the "**Local Rules**").

## III.     REQUEST FOR RELIEF

26.     By this Motion, pursuant to Sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rules 2002-1 and 6004-1, the Debtor requests the entry of two orders:   (I) a bidding procedures order (the "**Bidding Procedures Order**"), substantially in the form attached hereto as Exhibit A, (a) approving bidding procedures (the "**Bidding Procedures**"), attached to the Bidding Procedures Order as Exhibit 1, in connection with the sale of certain of the Debtor's assets and the assumption and assignment of certain contracts to the Purchaser (the "**Sale**"); (b) scheduling an auction (the "**Auction**"), at which the Debtor will solicit competing bids for the Sale pursuant to the Bidding Procedures; (c) approving a break-up fee for the Stalking Horse as protection against a higher and better bid; (d) scheduling a final sale hearing (the "**Sale Hearing**") to approve the Sale of the Debtor's Assets (defined below) to the Stalking Horse or to the successful bidder or bidders at

the Auction and establishing a deadline for filing objections to the Sale (the "**Objection Deadline**"); and (e) approving the form and manner of notice of the Auction and Sale Hearing (the "**Notice of Auction and Sale**"), attached to the Bidding Procedures Order as <u>Exhibit 2</u>, and notice of assumption and assignment of contracts (the "**Notice of Assumption and Assignment**"), attached to the Bidding Procedures Order as <u>Exhibit 3</u>; and, upon completion of the Sale Hearing, (II) an order substantially in the form attached hereto as <u>Exhibit B</u> (the "**Sale Order**")[3] authorizing the Sale of the Debtor's Assets on the terms and conditions set forth in the APA attached hereto (without the Schedules) as <u>Exhibit C</u>, or to the successful bidder or bidders at the Auction, free and clear of any and all liens, claims, and interests of any kind, nature or description (collectively, the "**Liens**").

### A.     The Purchased Assets and Excluded Assets

27.     After consultation with its professionals and financial advisors and marketing its assets to key players in the pharmaceutical industry, the Debtor has determined that the sale of substantially all of its assets to Victory for the Purchase Price is in the best interest of all of the Debtor's stakeholders and is likely to pay all creditors in full and to provide for a meaningful distributions to shareholders (depending on the resolution of certain disputed claims).

28.     The APA between the Debtor and Victory provides for the transfer of substantially all of the Debtor's assets to Victory including certain contracts to be assumed, fixtures, inventory, promotional materials, product equipment, product records, applicable

---

[3]     If no Qualifying Bids are submitted by the Bid Deadline (as defined in the Bidding Procedures), the Debtor may submit to the Court a revised Sale Order reflecting that no Auction was held and seeking approval of the Sale to the Stalking Horse.

permits and regulatory files, intellectual property, certain assumed claims, and other assets identified on Schedule A.1(o) to the APA (collectively, the "**Assets**").[4]

29.     The Assets to be transferred to Victory do not include real property or real property leases, certain excluded contracts, avoidance actions or claims other than specific assumed claims, permits or licenses other than specific applicable permits, rights or assets relating to any benefit plan, cash and accounts receivable, prepaid items or deposits, tax returns, tax refunds, tax attributes, bank accounts and records, corporate books and records, insurance policies and unearned premiums or refunds, or the assets, properties, and rights set forth on Schedule 1.2(l) to the APA (collectively, the "**Excluded Assets**").

**B.     The Proposed Sale of the Assets**

30.     The APA provides that the proposed Sale of the Assets is subject to higher and better offers, binding the Debtor only to pay a break-up fee (described below) to the Stalking Horse in the event that the Bankruptcy Court does not approve the Sale to the Stalking Horse or the Sale to the Stalking Horse does not close prior to October 15, 2010, and the Debtor terminates the APA as a result. The Debtor reserves the right to withdraw this Motion at any time prior to the Sale Hearing, subject only the Remedies set forth in the APA. The principal terms and conditions of the APA are as follows:[5]

   a.   **Purchase Price.** The Purchase Price of the Assets is $17,100,000, as adjusted by the Adjustment Amount[6] agreed to by the Parties prior to Closing, plus certain assumed liabilities. APA § 1.5.

---

[4]     As noted above, the Schedules to the APA are not attached hereto, but are available upon request upon the execution of an appropriate non-disclosure agreement.

[5]     Capitalized terms not defined herein shall have the meaning ascribed to them in the APA. To the extent there are any inconsistencies between this summary description and the APA, the terms of the APA shall control.

[6]     The Adjustment Amount, as defined in Exhibit A to the APA, is an amount equal to the excess of the dollar value of product sales divided by a number calculated based on the Closing Date of the Sale, plus Purchaser Cure Amounts actually paid by the Debtor prior to closing. The Adjustment Amount can be in either party's favor.

b. **Break-up Fee.** In the event the Sale to the Stalking Horse does not close prior to October 15, 2010, or the Court does not grant an order approving the Sale of the Assets to the Stalking Horse, and the Debtor actually closes a Sale of the Assets to a purchaser other than the Stalking Horse, then the Debtor shall pay to the Stalking Horse $400,000 (the "**Break-up Fee**"), plus the Stalking Horse's actual expenses up to a maximum amount of $150,000, by wire transfer of immediately available funds within two (2) business days after termination of the APA or the closing of the Sale to a purchaser other than the Stalking Horse. APA § 8.4.

c. **Termination of the APA.** The APA may be terminated at any time prior to Closing:

    i. by mutual written consent of the Seller and the Purchaser.

    ii. by either the Seller or the Purchaser:

        1. if a Governmental entity has issued a final and non-appealable Order or taken other final and non-appealable action, in any case having the effect of permanently restraining, enjoining or otherwise prohibiting the Sale; or

        2. if the Closing does not occur on or before October 15, 2010 (the "**Outside Date**"); provided, however, that a Party is not entitled to terminate the APA pursuant to this section if such Party's material breach of one or more of its covenants hereunder is the cause of or results in the failure of the Closing to occur on or before the Outside Date.

    iii. by the Purchaser:

        1. if the Seller breaches one or more of its covenants or any representations or warranties of the Seller become inaccurate and such breach or inaccuracy is not curable, cannot reasonably be cured by the Outside Date, or is not cured within ten (10) business days after the Purchaser provides notice to the Seller of the breach or inaccuracy; provided, however, that the Purchaser is not entitled to terminate the APA pursuant to this Section if the Purchaser is in material breach of one or more of its covenants hereunder or if at the time of such proposed termination, one or more of the Purchaser's representations or warranties are inaccurate in any material respect;

        2. if any Material Adverse Effect has occurred as contemplated by Section 6.2(e) of the APA and such Material Adverse Effect is not curable, cannot reasonably be cured by the Outside Date, or is not cured within fifteen (15) business days after the Purchaser provides notice to the Seller of the Material Adverse Effect;

3. if the Bankruptcy Court has not entered the Bidding Procedures Order by June 30, 2010, or the Bidding Procedures Order fails to be in full force and effect or has been stayed, reversed, modified, or amended in any respect without the prior written consent of the Purchaser; or

4. the Bankruptcy Court has not entered the Sale Order on or before August 31, 2010.

    iv. by the Seller:

1. if the Purchaser breaches one or more of its covenants or any representations or warranties of the Purchaser become inaccurate and such breach or inaccuracy is not curable, cannot reasonably be cured by the Outside Date, or is not cured within ten (10) business days after the Seller provides notice to the Purchaser of the breach or inaccuracy; provided, however, that the Seller is not entitled to terminate the APA pursuant to this Section if the Seller is in material breach of one or more of its covenants hereunder or if at the time of such proposed termination, one or more of the Seller's representations or warranties are inaccurate in any material respect.

    v. the APA shall terminate automatically if the Bankruptcy Court or any court of competent jurisdiction enters an Order approving a proposal from a purchaser other than the Stalking Horse or any of its Affiliates for the acquisition of any or all of the Assets.

    APA §§ 8.1, 8.2.

31.    In addition to the aforementioned terms of the APA, in accordance with Local Rule 6004-1(b)(iv), the Debtor highlights the following aspects of the APA:

a. **No Sale to an Insider.** The prospective Purchaser is not an insider of the Debtor within the meaning set forth in Section 101(31) of the Bankruptcy Code.

b. **Sale Agreements with Management.** No sale agreements have been entered into with management in connection with the Sale of the Assets.

c. **Releases.** No releases have been entered into in connection with the Sale of the Assets.

d. **Private Sale/No Competitive Bidding.** As disclosed herein, the Debtor intends to conduct an Auction for the Sale of the Assets. Neither the APA nor any other agreement prohibits the Debtor from soliciting competing offers for the Assets and the Debtor is not otherwise limited in shopping the Assets. Section 5.1 of the APA provides that the Auction and related solicitation shall be conducted in accordance with the Bidding Procedures Order.

e. **Closing and Other Deadlines.** The Closing must occur on or before October 15, 2010, and within three Business Days after the satisfaction or waiver of all conditions set for the in the APA, unless otherwise agreed to by the Parties.

f. **Good Faith Deposit.** In connection with the execution of the APA, the Purchaser made a good faith deposit of $1,710,000, which is refundable, pursuant to the terms of the Depositary Agreement, to the Purchaser if the APA is terminated pursuant to Sections 8.1(a)-(f) or 8.2, and payable to the Seller if the APA is terminated pursuant to Section 8.1(g).

g. **Interim Arrangements with Proposed Purchaser.** Article 5 of the APA addresses certain interim arrangements with the Purchaser, most of which provide that the Debtor shall continue to operate its business in the ordinary course, timely pay its postpetition obligations, and continue to honor and manage its rebate programs and return policies. Section 5.8 of the APA requires the Debtor to take affirmative steps to enter into an agreement for the manufacture of Keflex, subject to the Purchaser's consent. Section 5.9 of the APA prohibits the Debtor from selling any products (i) (A) in calendar month May, June or July 2010, with an aggregate value in excess of $400,000, (B) in calendar month August 2010, with an aggregate value in excess of $600,000, or (C) in calendar months beginning with September 2010 and later, with an aggregate value in excess of $750,000 and (ii) on the Closing Date or during the two (2) Business Days immediately preceding the Closing Date.

h. **Use of Proceeds.** No provision of the APA addresses the use of proceeds. Pursuant to Section 1.6 of the APA, the Purchase Price will be allocated in accordance with Schedule 1.6 to the APA and tax returns will be filed in accordance with the Allocation Schedule.

i. **Tax Exemption.** Section 7.9(a) of the APA addresses transfer taxes and provides that the Parties shall each bear one-half of any transfer tax resulting from the Sale and cooperate to timely prepare and file any tax returns relating to transfer taxes, including claims for exemption or exclusion from the application or imposition of transfer taxes. Pursuant to Section 1.2 of the APA, tax attributes unrelated to the transfer taxes addressed in Section 7.9(a) are Excluded Assets and will not be transferred to the Purchaser.

j. **Record Retention.** Section 1.2 of the APA provides that tax returns, bank account records, corporate records and minute books are Excluded Assets and will be retained by the Debtor. Additionally, Section 7.1(d) of the APA provides that the Debtor may retain one (1) or more copies of documentation (including written or electronic records, files, manuals, filings, etc.), including any Purchaser Confidential Information contained therein, that the Debtor delivers to the Purchaser as part of the Purchased Assets.

k. **Sale of Avoidance Actions.** Section 1.2(d) of the APA provides that Avoidance Actions are Excluded Assets and will be retained by the Debtor. The APA does

not otherwise involve the sale or, or impose limitations on, any Chapter 5 causes of action.

l. **Requested Findings as to Successor Liability.** The proposed Sale Order does contain findings regarding successor liability. Specifically, the proposed Sale Order contains the following language:

> The Purchaser shall not be liable for any claims against the Debtor other than as expressly provided for in the APA. Without limiting the generality of the other provisions of this Order, the Purchaser, under no circumstances, shall be deemed to be a successor of the Debtor. Accordingly, the Purchaser shall have no successor or vicarious or other liabilities of any kind with respect to the Debtor or the Purchased Assets, and all persons and entities shall be hereby enjoined from asserting any such claims against the Purchaser.

m. **Sale Free and Clear of Unexpired Leases.** Sections 1.2(a) and (b) of the APA provide that leases and real property are Excluded Assets not to be transferred to the Purchaser. The APA does not otherwise provide for the sale of real property or leasehold interests.

n. **Credit Bid.** The Debtor's Assets are unencumbered by any Lien, mortgage, or other security interest and credit bidding under Section 363(k) of the Bankruptcy Code is therefore inapplicable.

o. **Relief from Bankruptcy Rule 6004(h).** The Debtor is requesting relief from the 14-day stay imposed by Bankruptcy Rule 6004(h).

**C.** **Bidding Procedures and the Auction**

32. In order to maximize value for all of its stakeholders, the Debtor intends to initiate a competitive bidding process by making the Sale of the Assets through the APA subject to higher and better offers at an Auction. The proposed Bidding Procedures are set forth below, but may be modified, amended, or waived by the Debtor, in its sole discretion, after consultation with the Committee, so long as such modifications, amendments or waivers do not otherwise conflict with the terms and requirements set forth in the APA.

a. **Potential Bidder.** The Debtor shall deliver the Sale Motion to all parties who are known to have expressed an interest in acquiring the Assets and any other entity that requests service of the Sale Motion (the "**Potential Bidders**").

b. **Confidentiality Agreements.** The Debtor may afford any Potential Bidder the time and opportunity to conduct reasonable due diligence; provided such Potential Bidder enters into a confidentiality agreement (a "**Confidentiality Agreement**") limiting its use of such information and demonstrates sufficient financial wherewithal, in the Debtor's discretion, to consummate the Sale. Any Potential Bidder may obtain a copy of the Confidentiality Agreement from Gleacher, the Debtor's financial advisor. Gleacher and the Debtor may, on their own initiative, also send a copy of the Confidentiality Agreement to those parties who have not yet executed one but whom Gleacher or the Debtor has identified as being likely to be interested in making an offer to purchase the Assets and participating in the Auction. Thereafter, the Debtor and Gleacher shall entertain any further reasonable requests for additional information and due diligence from any party who has executed a Confidentiality Agreement and provided the required satisfactory evidence of financial wherewithal. The Debtor, in its discretion, may deny any such requests for additional information, if, after taking into account, among other things, business factors (such as whether or not the Potential Purchaser is currently a competitor of the Debtor), legal, regulatory, and other considerations, it determines that doing so would not be in the best interests of its estate and creditors or is otherwise contrary to the goals of the Auction and the Sale. If any due diligence material has not previously been provided to the Purchaser, then the Debtor shall simultaneously provide such material to the Purchaser.

c. **Bidding Deadline.** To participate in the Auction, a Potential Bidder must become a Qualified Bidder (defined below). Unless otherwise ordered by the Bankruptcy Court, for cause shown, or as otherwise determined by the Debtor, each Potential Bidder must have delivered to (a) Gleacher & Company, 1290 Avenue of the Americas, Fourth Floor, New York NY 10104, Attn: John Cramer, (b) Alston & Bird LLP, 1201 West Peachtree Street, Atlanta, Georgia 30309-3424, Attn: Sarah Ernst, Esq., and (c) Victory Pharma, Inc., 11682 El Camino Real, Suite 250 San Diego, CA 92130, with a copy to Reed Smith LLP, 599 Lexington Avenue, New York, NY 10022 Attn: Mr. Andres Liivak and Mr. Mark Pedretti (but with respect to Victory Pharma, Inc., only Item No. d.iii(c), below, shall be sent to Victory Pharma, Inc.), and (d) counsel to the Committee, Dickstein Shapiro LLP, 1825 Eye Street, NW, Washington, DC 20006, Attn: Sam J. Alberts a Competing Bid (defined below), such that the Competing Bid is received no later than 4:00 pm prevailing Eastern Time on the date that is at least five (5) business days before the date set for the Auction (the "**Bidding Deadline**").

d. **Competing Bid.** A Competing Bid consists of the following:

    i. An executed Confidentiality Agreement;

    ii. Current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Debtor) of the Potential Bidder or of those entities that will guarantee the obligations of the Potential Bidder;

iii. A bid letter including a written expression of the Potential Bidder's initial bid that includes: (a) such bidder's initial bid (an "**Initial Bid**"), (b) a statement that such bidder is willing to proceed as a buyer on a basis substantially similar to that of Purchaser, and (c) a binding, definitive, and irrevocable executed copy of the APA marked with interlineations indicating any modifications thereto required by such Potential Bidder (which agreement shall not contain the provisions set forth in Section 8.4 of the APA or otherwise entitle such bidder to any Termination Fee or the other Bidding Procedures set forth therein);

iv. Provide an earnest money deposit equal to 10% of the Potential Bidder's Initial Bid, which deposit shall be no less than $1.7925 million (the "**Bid Deposit**"); and

v. Provide sufficient indicia that such Potential Bidder or its representative is legally empowered, by power of attorney or otherwise (i) to bid on behalf of the Potential Bidder and (ii) to complete and sign, on behalf of the bidder, a binding and enforceable APA.

e. **Purchased Assets and Assumed Liabilities.** Each Competing Bid must also: (a) specify the portion of the consideration to be paid in cash and the portion to be paid in any other form of value (if any), including specifying any liability of the Debtor that such bidder intends to assume in connection with the Sale above and beyond the Assumed Liabilities; (b) if any consideration above and beyond the assumption of the Assumed Liabilities is to be provided in a form other than cash, provide information concerning such consideration to permit the Debtor to accurately assess the value of such consideration; (c) if the Competing Bid contemplates a purchase of less than all of the Purchased Assets, provide sufficient detail concerning which of the Purchased Assets would not be purchased thereby; (d) not contain any contingencies to closing that are not set forth in Article VI of the APA, including, without limitation, contingencies for financing, diligence, board approval, or similar contingencies or condition; (e) identify with particularity each and every executory contract or unexpired lease the assumption and assignment of which is a condition to closing, to the extent different from the Assigned Agreements proposed to be assumed under the APA; (f) require the Qualified Bidder to consummate the Sale on substantially the same timing as set forth in the APA; and (g) fully disclose the identity of the entities, if any, which shall be acquiring directly or indirectly a portion of the Assets under or in connection with the Competing Bid.

f. **Qualified Bidder.** A Qualified Bidder is a Potential Bidder that delivers a Competing Bid and that the Debtor determines is reasonably likely (based on financial information submitted by the Potential Bidder, the availability of financing, experience and other considerations deemed relevant by the Debtor) to submit a bona fide offer and to be able to consummate the proposed transaction if selected as the Winning Competing Bidder (defined below) within the time frame provided by the APA and the Sale Motion. The Debtor may request additional

information from a Potential Bidder to evaluate the bidder's ability to consummate the Sale and to fulfill its obligations in connection therewith, and such bidder will be obligated to provide such information as a precondition to participating further in the Auction. As promptly as practicable after a Potential Bidder delivers all of the materials required of a Competing Bid, and in no event later than five (5) days before the Auction, the Debtor shall determine, in consultation with the Committee, and shall notify each Potential Bidder and the Purchaser in writing, whether such Potential Bidder is a Qualified Bidder. Notwithstanding the foregoing, Purchaser shall be deemed a Qualified Bidder for purpose of the Auction. Each Qualified Bidder participating in the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding process or the Sale.

g. **Bid Deposit.** The Bid Deposit shall be in the form of a wire transfer to the account of an escrow agent selected by the Debtor (the "**Escrow Agent**"), pursuant to instructions to be provided upon request. The Bid Deposit, together with any interest earned thereon, shall be returned to any Bidder whose Bid is not accepted by the Debtor within three (3) business days of the conclusion of the Sale Hearing, except that in the case of the party who submits the Alternate Winning Competing Bid (as such term is defined below) the Debtor reserves the right to retain such bidder's Bid Deposit until three (3) business days after the transaction with the Winning Competing Bidder has been consummated. If the entity that makes the Winning Competing Bid (as such term is defined below) fails to consummate the purchase of the Assets, and such failure to consummate the purchase is the result of a breach by the Winning Competing Bidder, such bidder's deposit shall be forfeited to the Debtor and the Debtor specifically reserves the right to seek all available damages from the defaulting offeror.

h. **Initial Bid of a Qualified Bidder.** An Initial Bid of a Qualified Bidder shall not provide a purchase price that is less than Seventeen Million and Nine Hundred and Twenty-Five Thousand U.S. Dollars (U.S. $17,925,000) in cash plus an additional amount in cash equal to the Purchaser Cure Amounts (if any) paid by the Seller prior to such point in time (collectively, the "**Initial Competing Bid Amount**"), such amount being the sum of the (i) Sixteen Million and Seven Hundred and Fifty Thousand U.S. Dollars (U.S. $16,750,000), as set forth in Section 1.5(a) and (b) of the APA, (ii) Three Hundred and Fifty Thousand U.S. Dollars (U.S. $350,000), which is the Escrow Amount set forth in Section 1.5(c) of the APA; (iii) Four Hundred Thousand U.S. Dollars (U.S. $400,000) (the "**Breakup Fee**"), (iv) One Hundred Fifty Thousand U.S. Dollars ($150,000) on account of the Purchaser's actual expenses incurred (the "**Expense Reimbursement Fee**"), (v) Two Hundred Seventy-Five Thousand U.S. Dollars (U.S. $275,000) (the "**Initial Bid Increment**"), and (vi) Purchaser Cure Amounts paid by the Seller prior to such point in time; plus assumption of at least the Assumed Liabilities, or increased cash in the amount of the Assumed Liabilities.

i. **Revocation and Alternate Winning Competing Bid.** Competing Bids submitted on or prior to the Bidding Deadline, as same may be modified by a

bidder at the Auction, shall remain open and irrevocable until the Sale Hearing. Acceptance of a Bid shall, in all respects, be subject to entry of an order by the Court that, among other things, authorizes the Debtor to consummate a sale to the Winning Competing Bidder (as defined below). Following the Sale Hearing, if Purchaser or any Winning Competing Bidder (as the case may be) fails to consummate an approved sale because of a breach or failure to perform on its part, the next highest or otherwise best Qualified Bid, as disclosed at the Auction (the "**Alternate Winning Competing Bid**"), shall be deemed to be the Winning Competing Bid, and the Debtor shall be authorized, but not required, to consummate the Sale with the Qualified Bidder submitting such bid (i) without the need for further notice or order of the Court and (ii) without prejudice to the Debtor's right to seek all available damages from the defaulting offeror.

j.  **No Competing Bids.** If no timely, conforming Competing Bids are received by the Bidding Deadline (unless the Debtor has extended such deadline in accordance with the terms hereof), then the Auction will not be held, Purchaser will be deemed the Winning Competing Bidder, and the Debtor may, but is not required to, seek approval of the APA at the Sale Hearing.

k.  **Auction.** If one or more Competing Bids (other than the Purchaser's) are received, the Auction will be conducted at the offices of Alston & Bird LLP, 90 Park Avenue, New York, New York 10016, or at another location as may be timely disclosed by the Debtor to Qualified Bidders and Purchaser, at a date to be disclosed promptly upon entry of the Bidding Procedures Order, but in no event earlier than five (5) business days prior to the Sale Hearing (the "**Auction Date**"). The Auction will be conducted openly and all creditors will be permitted to attend. All Qualified Bidders must appear in person at the Auction, or through a duly authorized representative.

    i.  **Transcription.** The Auction will be transcribed by a court reporter, or videotaped at the Debtor's discretion.

    ii.  **Highest and Best Bid.** At or prior to the commencement of the Auction, the Debtor will notify all Qualified Bidders, including Purchaser, of the then highest and best Qualified Bid received by that time (the "**Highest and Best Bid**").

    iii.  **Subsequent Overbid.** Initial bidding shall begin at the Auction with the Highest and Best Bid. Each subsequent bid (each, a "**Subsequent Overbid**") must have a purchase price that exceeds the purchase price of the previous highest bid by at least Two Hundred and Fifty Thousand U.S. Dollars (U.S. $250,000). Unless otherwise specified by the Debtor, in consultation with the Committee, the Auction shall be completed on the Auction Date. Except as otherwise set forth herein, the Debtor may conduct the Auction in the manner it determines will result in the highest, best or otherwise financially superior offer(s) for the Acquired Assets. Any such rules must provide that: (A) the procedures will be fair and

open, with no participating Qualified Bidder disadvantaged in any material way as compared to any other Qualified Bidder; (B) the true identity of each bidder will be fully disclosed to all other bidders and all material terms of each Qualified Bid will be fully disclosed to all other bidders throughout the entire Auction; and (C) each Qualified Bidder will be permitted a fair, but limited, amount of time to respond to the previous bid at the Auction.

    iv. **Rounds.** Unless otherwise specified by the Debtor, in consultation with the Committee, the Auction will continue in one or more rounds of bidding and shall conclude after each participating bidder has had an opportunity to submit an additional Subsequent Overbid, after being advised of the then-highest bid and the identity of the party making such next highest bid.

    v. **Higher and Better Bids.** In considering every bidder's bids, the Debtor shall take into account the Breakup Fee and Reimbursement Fee. The Stalking Horse shall be entitled to make a revised higher or better offer at any time prior to the conclusion of the Auction.

    vi. **Additional Terms and/or Conditions.** The Debtor further reserves the right to (a) amend and/or impose additional terms and/or conditions at or prior to the Auction that they believe will better promote the goals of the Auction and do not otherwise conflict with the terms and requirements set forth in the APA, (b) extend the deadlines set forth in the Bidding Procedures and/or adjourn the Auction at the Auction and/or the Sale Hearing in open court or on the Bankruptcy Court's calendar on the date scheduled for said hearing without further notice to creditors or parties-in-interest, and (c) to withdraw the Sale Motion at any time prior to the conclusion of the Sale Hearing.

l. **Winning Competing Bid.** Upon conclusion of the Auction, the Debtor shall (i) review each Qualified Bid or bids (as and to the extent such bids were increased at the Auction) on the basis of financial and contractual terms and the factors relevant to the Sale Process, including those factors affecting the speed and certainty of consummating the Sale, and (ii) identify the highest and otherwise best offer for the Purchased Assets as the winning competitive bid ("**Winning Competing Bid**") and such entity submitting the Winning Qualified Bid will be the winning competing bidder ("**Winning Competing Bidder**").

33. To the extent that the Purchaser's bid embodied in the APA is not the Winning Competing Bid at the Auction, the Debtor will file with the Court a supplement (the "**Supplement**") that will inform the Court of the results of the Auction and the Winning Competing Bid. The Supplement will identify, among other things, (a) the Winning Competing

Bidder, as the proposed purchaser of the Assets, (b) the consideration to be paid by such purchaser for the Assets, and (c) any executory contracts and unexpired leases to be assumed and assigned to the purchaser in connection with the Sale (to the extent different from the Assigned Agreements proposed to be assumed and assigned to the Purchaser under the APA). In addition, the Debtor will attach to the Supplement, as exhibits, (a) any revised proposed order approving the Sale, (b) copies of the asset purchase agreement entered into by the Debtor and the Winning Competing Bidder, and (c) information necessary to provide adequate assurance of the Winning Competing Bidder's ability to perform.

34. As promptly as is reasonably practicable prior to the Sale Hearing, the Debtor will file and serve the Supplement on (i) the U.S. Trustee, (ii) counsel to the Committee, (iii) counsel to the Purchaser, (iv) any party who timely submitted a Competing Bid, (v) any parties entitled to notice under Local Rule 2002-1(b), and (vi) any person who submits a written request therefor to Alston & Bird LLP, 1201 West Peachtree Street, Atlanta, Georgia 30309-3424, Attn: David Wender, Esq., (E-mail, david.wender@alston.com; Facsimile: (404) 253-8521).

35. In accordance with Local Rule 6004-1(c), the Debtor highlights the following aspects of the Auction and the Bidding Procedures:

    a. **Provisions Governing Qualifications of Bidders.** *See infra* ¶ 32(b), (d), (f).

    b. **Provisions Governing Qualifying Bids.** *See infra* ¶ 32(c), (d), (g), (h).

    c. **Provisions Providing Bid Protections to Stalking Horse Bidders or Initial Bidders.**

        i. **No Shop or No Solicitation Provisions.** *See infra* ¶ 31(d); APA Section 5.1.

        ii. **Break-up/Topping Fees and Expense Reimbursement.** *See infra* ¶ 30(b); APA Section 8.4.

        iii. **Bidding Increments.** *See infra* ¶ 32(k)(iii).

    iv. **Treatment of Breakup or Topping Fees and Expense Reimbursement at Auction.** *See infra* ¶ 32(k)(v).

  d. **Modification of Bidding and Auction Procedures.** *See infra* ¶ 32(k)(vi).

  e. **Closing with Alternative Backup Bidder.** *See infra* ¶ 32(i).

**D.** **Approval of the Bidding Procedures and the Auction**

36. Bankruptcy Rule 6004(f) provides that sales of property outside the ordinary course of business may be by private sale or public auction. The Debtor believes that the Sale of its Assets through the Auction, pursuant to the Bidding Procedures, will maximize the sale proceeds received by the estate, which is "[t]he paramount goal in any proposed sale of property of the estate." *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *253 (Bankr. D. Del. Aug. 15, 2007).

37. The Bidding Procedures allow the Debtors to conduct the Auction in a controlled, fair, and open manner that will encourage competitive bidding by financially capable bidders, thus increasing the likelihood that the Debtor will receive the highest and best consideration for the Assets. Bidding procedures may be approved when they are designed to maximize the value of a debtor's assets and enhance competitive bidding. *Id.* (citing *Calpine Corp. v. O'Brien Envt'l Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999)). The Debtor believes that the proposed Bidding Procedures are appropriate, will maximize the value of the Assets, and are consistent with other procedures previously approved by courts in this district. The Debtor therefore requests that the Court approve the process and procedures set forth in the Bidding Procedures for the submission and consideration of competing bids for the Debtor's Assets.

**E.** **The Sale Hearing and Approval of the Notice of Auction and Sale**

38. The Debtor requests that the Court schedule the Sale Hearing to consider approval of the APA and the Sale, or the approval of any higher and better offer resulting from the

Auction for July 28, 2010, or as soon thereafter as the Court's calendar permits, and approve the Debtor's scheduling of the Auction between July 19, 2010, and July 23, 2010. Bankruptcy Rule 6004(a) provides that "[n]otice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k), and if applicable, in accordance with Section 363(b)(2) of the Code." Bankruptcy Rule 2002(a)(2) requires that a debtor provide parties in interest at least twenty-one (21) days' notice by mail of a sale of property outside the ordinary course of business. Bankruptcy Rule 6004(b) further provides that objections to a sale outside the ordinary course of business be filed and served not less than seven (7) days prior to any related auction or within the time fixed by the court.

39.     The Notice of Auction and Sale contains the type of information required under Bankruptcy Rule 2002(c), and also includes information regarding the Auction procedures to the extent a higher or better offer other than the APA is obtained and the Auction takes place. The Debtor therefore requests that this Court approve the form and content of the Notice of Auction and Sale.

40.     The Debtor's proposed schedule provides at least twenty-one (21) days' notice of the Sale Hearing, which complies with the Bankruptcy Rules. The Debtor proposed to provide notice as follows: the Debtor shall cause to be served, within five (5) business days after entry of the Bidding Procedures Order (the "**Mailing Deadline**"), by regular mail, overnight courier, electronic mail, or same-day messenger delivery, copies of the Notice of Auction and Sale upon: (i) the U.S. Trustee, (ii) counsel to the Committee, (iii) counsel to the Purchaser, (iv) any party who, in the past twelve (12) months, expressed in writing to the Debtor an interest in acquiring the Assets and who the Debtor and their representatives reasonably and in good faith determine

potentially have the desire and financial wherewithal to effectuate the Sale, and (v) any parties entitled to notice under Local Rule 2002-1(b).

41.     The Debtor submits that such notice shall constitute good and sufficient notice of the Auction and Sale of the Debtor's Assets and that no other or further notice need be given and therefore request that the Court approve the Notice of Auction and Sale and the manner of the service and notice related thereto.

**F.     Assumption and Assignment of Contracts**

42.     To facilitate the Sale and the assumption and assignment of the contracts assumed under the APA (the "**Assumed Contracts**"), the Debtor will serve a notice of intent to assume and assign the contracts (the "**Assumption and Assignment Notice**") on all non-debtor parties to the Assumed Contracts according to the following procedures:

a. On or before the Mailing Deadline, the Debtor shall cause to be served, by regular mail, overnight courier, electronic mail, or same-day messenger delivery, the Assumption and Assignment Notice substantially in the form attached to the Bidding Procedures Order as Exhibit 3, upon all known non-debtor parties to the Assumed Contracts. The Assumption and Assignment Notice shall set forth (i) the intent of the Debtor to assume the Assumed Contracts and assign them to the Purchaser or the Winning Competing Bidder, as applicable, and (ii) applicable cure amounts (the "**Cure Amounts**"), if any. The Assumption and Assignment Notice shall identify the Assumed Contracts and the Cure Amounts that the Debtor believes must be paid to cure all defaults under the Assumed Contracts.

b. Bankruptcy Rule 6006(a) provides that "[a] proceeding to assume, reject, or assign an executory contract or unexpired lease other than as a part of a plan, is governed by Rule 9014." Any objections to (i) the assumption and assignment of an Assumed Contract, or (ii) the amount asserted as the Cure Amount (each, an "**Assumption and/or Cure Objection**") must be in writing and set forth with specificity the nature of the objection and/or the cure amount that the objecting party believes should be paid in connection with the assumption of the Assumed Contract (the "**Claimed Cure Amount**").

c. If an Assumption and/or Cure Objection is timely filed, the Debtor requests that a hearing with respect to that objection shall be held before the Court at the Sale Hearing. If, however, an Assumption and/or Cure Objection is not timely filed and served, the assumption and assignment of the applicable Assumed Contract will proceed without further notice. The Debtor also requests that parties that fail

to file and serve timely Assumption and/or Cure Objections shall be deemed to have waived and released any and all rights to assert Cure Amounts differing from those listed on the exhibit to the Assumption and Assignment Notice and, subject to payment of the Cure Amount on such Assumed Contract, shall be forever barred and estopped from asserting or claiming against the Debtor, Purchaser, or Winning Competing Bidder, as applicable, that any additional amounts are due or defaults exist, or prohibitions or conditions to assignment exist or must be satisfied under the Assumed Contract.

d. If no Cure Amounts are due under the Assumed Contract and the non-debtor party to the Assumed Contract does not otherwise object to the Debtor's assumption and assignment of the Assumed Contract, no further action need be taken on the part of that non-debtor party. The Debtor also requests that Assumption and/or Cure Objections that object solely to the Cure Amount may not prevent or delay the Debtor's assumption and assignment of any Assumed Contract. If a party objects solely to a Cure Amount, the Debtor may, in its discretion, hold the Claimed Cure Amount in reserve pending further order of the Court or mutual agreement of the parties. So long as the Debtor holds the Claimed Cure Amount in reserve, and there are no other unresolved objections to assumption and assignment, the Debtor can, without further delay, assume and assign the Assumed Contract that is the subject of the objection and the objecting party's recourse shall be limited to the funds held in reserve.

43. The Debtor submits that the aforementioned procedures provide sufficient notice to non-debtor parties to the Assumed Contracts and should be approved.

## G.   The Objection Deadline

44. The Debtor requests that, pursuant to Bankruptcy Rule 9014, objections, if any, to the Sale (a "**Sale Objection**") or an Assumption and/or Cure Objection (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) be filed with the Clerk of the Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware, 19801, on or before July 21, 2010, at 4:00 p.m. (Eastern Time) (the "**Objection Deadline**"), or on such later date and time as the Debtor may agree, and (iv) with a copy served on the (a) counsel to the Debtor, Alston & Bird LLP, 1201 West Peachtree Street, Atlanta, Georgia 30309-3424, Attn: Matthew W. Levin; (b) local counsel to the Debtor, Young, Conaway, Stargatt and Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, P.O. Box

391, Wilmington, Delaware 19801-0391, Attn: Joel Waite; (c) counsel to the Purchaser, Reed Smith LLP, 599 Lexington Avenue, New York, NY 10022, Attn: Andres Liivak and Mark Pedretti; (d) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Jane Leamy; (e) counsel to the Committee, Dickstein Shapiro LLP, 1825 Eye Street, NW, Washington, DC 20006, Attn: Sam J. Alberts; and (f) all parties that requested notice pursuant to Local Rule 2002-1(b).

45.     In the event the Debtor files a Supplement following the Auction proposing to sell the Assets to a Winning Competing Bidder, any objections to the transactions disclosed in the Supplement, including the assumption and assignment of contracts or cure amounts in connection therewith, shall be filed and served in accordance with the procedures set forth above no less than one business day prior to the Sale Hearing.

## IV.     BASIS FOR RELIEF

### A.     Approval of the Sale is Warranted under Sections 363(b) and 105(a) of the Bankruptcy Code

46.     Section 363(b) of the Bankruptcy Code provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); 11 U.S.C. § 1107(a) (providing that debtors in possession have "all the rights...of a trustee"). In addition, Section 105(a) provides the authority for this Court to carry out the provisions of Section 363(b). *See* 11 U.S.C. § 105(a) ("The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.") Although Section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if the sale is based upon the sound business judgment of the debtor. *See Dura Auto. Sys., Inc.*, 2007 Bankr. LEXIS 2764, at *258 (citing

*Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996)); *Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.* and requiring good faith); *In re Del. and Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies* decision); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same).

47.     When a valid business judgment exists, the law vests the debtor's decision to sell assets with a strong presumption that "in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in honest belief that the action taken was in the best interests of the company." *Dura Auto. Sys., Inc.*, 2007 Bankr. LEXIS 2764, at *260 (citing *The Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992)).  Once a court is satisfied there is a sound business judgment for the proposed sale, the court must then determine whether (i) the debtor in possession has provided the interested parties with adequate and reasonable notice and (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *See, e.g., Del. and Hudson Ry. Co.*, 124 B.R. at 166.

48.     The Debtor submits that its decision to sell its Assets is based upon the sound business judgment of its management, is in the best interest of its estate and its stakeholders, and should be approved.  Prior to and since the commencement of the Bankruptcy Case, the Debtor has worked diligently with its financial advisors to explore alternatives to sell certain of its business assets in a manner that would provide value to the estate and relieve the Debtor of ongoing operational expenses, or to reorganize on a stand-alone basis.  The Debtor believes that

its prepetition marketing efforts, arms' length negotiations with the Purchaser, and the proposed Bidding Procedures will, based on its marketing efforts to date, achieve the best results for its estate and will maximize value for all stakeholders. The Bidding Procedures contemplate an open auction process and are designed to ensure that the ultimate purchase price of the Debtor's Assets is fair and reasonable. If, however, no timely, confirming Competing Bids are received other than the APA, the Debtor believes that the prompt sale of the Debtor's Assets to the Purchaser without an Auction and without further delay presents the best opportunity to maximize and preserve value for its estate. For these reasons, the Debtor submits that the proposed Sale of its Assets is within its sound business judgment.

**B.**     **The Sale of the Assets Free and Clear of Liens or Interests is Warranted**

49.     Under Section 363(f) of the Bankruptcy Code, a debtor in possession may sell property "free and clear of any interest in such property of an entity other than the estate" if any of the following conditions are satisfied:

1.     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

2.     such entity consents;

3.     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

4.     such interest is in bona fide dispute; or

5.     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

50.     The Debtor believes that one or more of the tests of Section 363(f) of the Bankruptcy Code are satisfied with respect to the Sale of the Assets. Most importantly, the

Debtor's Assets are unencumbered by any recorded lien, security interest, mortgage, judgment, or other encumbrance. Though the Debtor is not aware of any, to the extent there is any unrecorded interest in the Debtor's Assets, Section 363(f)(5) would apply to permit the Sale free and clear of such interest. The Debtor believes that the rights of any unknown claimant could be valued and allowed as a claim against the Debtor's estate, and thus the claimant could be compelled to accept a money satisfaction of its interest in property, thus satisfying Section 363(f)(5). *See In re Trans World Airlines, Inc.*, 322 F.3d 283, 289, 291 (3d Cir. 2003) (holding that Section 363(f)(5) was satisfied in respect of successor liability claims because if the debtor's assets had been liquidated under Chapter 7 of the Bankruptcy Code, the claims at issue would have been converted to dollar amounts and the claimants would have received the distribution provided to other general unsecured creditors on account of their claims).

### C. Assumption and Assignment of Executory Contracts is Warranted

51.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts, subject to court approval, provided the defaults under such contracts are cured and adequate assurance of future performance is provided. 11 U.S.C. § 365. The standard applied by the Third Circuit in determining whether an executory contract may be assumed is the debtor's business judgment that the assumption is in the debtor's best economic interest. *See, e.g., Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (describing the business judgment test as "traditional").

52.     To facilitate and effect the Sale of the Debtor's Assets, the Purchaser has agreed to take assignment of the Assumed Contracts. The Debtor believes that it can demonstrate at the Sale Hearing that all of the requirements for the assumption and assignment of the Assumed

Contracts will have been satisfied. The Debtor has evaluated the financial wherewithal of the Purchaser, and will evaluate the financial wherewithal of any Potential Bidder, and, in exercising its sound business judgment, believes that selling the Assets and assuming and assigning the Assumed Contracts is in the best interest of the estate. Moreover, as noted above, each non-debtor party to an Assumed Contract will receive notice of the proposed assumption and assignment, and the proposed cure amount, and have a reasonable opportunity to object thereto.

### D. A Good Faith Finding is Warranted

53. Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). The Debtor has fully disclosed and requested the Court's approval of all of the terms and conditions of the proposed Sale and intends to provide notice as directed by the Court. *See generally In re Colony Hill Associates*, 111 F.3d 269 (2nd Cir. 1997) (stating that determination of "in good faith" is based upon traditional equitable principles, including whether there has been full disclosure to the bankruptcy court). Further, the Purchaser is an entity unrelated to the Debtor, the APA was intensely negotiated at arms' length with all parties involved acting in good faith, and each represented by separate and sophisticated counsel. The Debtor is unaware of any facts or circumstances that might compromise or taint the Purchaser's good faith in negotiating and entering into the APA. The Debtor submits that it has acted in good faith and that the Purchaser is entitled to the protections of a good faith purchaser under Section 363(m) of the Bankruptcy Code.

### E.  The Break-up Fee is Reasonable and Appropriate

54.  Bidding incentives, such as the Break-up Fee, which includes expense reimbursement, encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the Chapter 11 process. "Agreements to provide breakup fees or reimbursement of expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers." *In re S.N.A. Nut Co.*, 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995); *Integrated Res., Inc.*, 147 B.R. at 650 (such fees are "important tools to encourage bidding and to maximize the value of the debtor's assets.").

55.  A proposed bidding incentive, such as the Break-up Fee, should be approved when it is in the best interest of the estate. *See S.N.A. Nut Co.*, 186 B.R. at 104; *In re America West Airlines, Inc.*, 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Indus., Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992).  Typically, this requires that the bidding incentive provide some benefit to the debtor's estate and, in this Circuit, that benefit must meet the administrative expense standards of the Bankruptcy Code. *See Calpine Corp. v. O'Brien Envt'l Energy, Inc.*, 181 F.3d at 533 (holding that while bidding incentives are measured against a business judgment standard in a non-bankruptcy context, the administrative expense provisions of Section 503(b) of the Bankruptcy Code governs a bankruptcy context); *see also In re Reliant Energy Channelview LP*, 2010 U.S. App. LEXIS 956, at *19-20 (following *Calpine Corp. v. O'Brien Envt'l Energy, Inc.*, and holding that a break-up fee was not an actual and necessary administrative expense when the stalking horse bid was not expressly conditioned upon the approval of the break-up fee).

56.     Here, the Break-up Fee will be paid only if the Sale to the Purchaser does not close by the Outside Date and the Debtor terminates the APA as a result, or if the Bankruptcy Court enters an order approving the acquisition of any or all of the Debtor's Assets and such acquisition closes.  In the event the Debtor receives qualifying Competing Bids and a Winning Competing Bidder prevails at the Auction, given the requirements for Competing Bids, the Debtor will effectively net no less than $275,000, thus benefiting from the floor set by the Purchaser's initial bid.

57.     Break-up fees are appropriate when they encourage – instead of stifle – bidding. *Integrated Res., Inc.*, 147 B.R. at 660.  As is customary, the Break-up Fee was required by the Purchaser as a condition to its spending the significant time and expense to negotiate and ultimately agree to the APA.  The Debtor believes that the Break-up Fee will not stifle bidding and, to the contrary, will encourage bidding by serving to (1) attract or retain a potential successful bid, (2) establish a bid standard for others to follow, and/or (3) to attract additional bidders. *See id.* at 662.

58.     "[A] break-up fee should constitute a fair and reasonable percentage of the proposed Purchase Price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser.  When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." *Id.*  The Break-up Fee is equal to approximately 2.3% of the Purchase Price, plus the expense reimbursement capped at $150,000, making the maximum aggregate Break-up Fee and expense reimbursement equal to 3.2% of the Purchase Price, which is within the range of fees typically paid in other significant sale transactions approved by courts in this District.  *See, e.g., In re HHL Fin. Servs. Inc.*, No. 97-398 (SLR) (D. Del., March 31, 1997) (approving 5.5% to 5.9% break-up fees); *In re Am. White*

*Cross, Inc.*, No. 96-1109 (PJW) (Bankr. D. Del., March 31, 1997) (approving up to 5.8% break-up fee); *In re Mid-Am. Waste Sys., Inc.*, No. 97-0104 (PJW) (Bankr. D. Del. Jan. 1997) (3.3% fee approved); *In re Simmons Upholstered Furniture, Inc.*, Case No. 94-635 (HSB) (Bankr. D. Del., Aug, 10, 1995) (approving 4.64% fee); *In re Smith Corona Corp.*, No. 95-788 (HSB) (Bankr. D. Del., Nov. 1995) (approving 3.9% fee); *In re Edison Bros. Stores, Inc.*, No. 95-1354 (Bankr. D. Del., Dec. 29, 1995) (approving break-up fees up to 3.5%). Given the Purchase Price, the Debtor, in its business judgment, believes that the Break-up Fee is appropriate.

59. For these reasons, and because of the benefits conferred upon the Debtor's estate by the Purchaser in entering into the APA, the Debtor respectfully requests that the Court approve the payment of the Break-up Fee and its treatment as an administrative expense of the Debtor and its estate under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code.

**F.**     **Relief from the Fourteen Day Stay is Warranted**

60. The Debtor requests that the Court waive the fourteen-day stay period under Bankruptcy Rule 6004(h) and order that, if and when entered, the Sale Order be effective immediately. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise." The purpose of this rule is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Bankruptcy Rule 6004(h). Although this rule and the Advisory Committee Note are silent as to when a court should "order otherwise," it has been suggested that the stay period should be waived to allow a transaction to close immediately when there has been no objection to procedure. 10 *Collier on Bankruptcy* 15th Ed. Rev. ¶ 6004.10 (2006). Well in advance of the Sale Hearing, the Debtor will have provided notice of the Sale and the Objection Deadline will

have passed. Accordingly, the Debtor submits that a waiver of the fourteen day stay is appropriate under Bankruptcy Rule 6004(h).

## V.    NOTICE

61.    The Debtor has served notice of this Motion on (a) the United States Trustee; (b) counsel to the Committee; (c) counsel to the Purchaser; and (d) all parties that requested notice pursuant to Local Rule 2002-1(b). The Debtor submits that no other or further notice need be provided.

WHEREFORE, the Debtor respectfully requests that the Court (i) enter the proposed Bidding Procedures Order, (ii) upon the completion of the Sale Hearing, enter the proposed Sale Order, and (iii) grant such other and further relief as is just and proper.

DATED: May 17, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Joel A. Waite (No. 2925)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19801-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

Matthew W. Levin
David A. Wender
Sage M. Sigler
Jonathan T. Edwards
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

Proposed Attorneys for the Debtor