# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MIDDLEBROOK PHARMACEUTICALS, | : | Case No. 10-11485 (MFW) |
| INC.,[1] | : | **Objection Deadline: June 3, 2010, 12:00p.m.[2]** |
| | : | |
| | : | **Hearing Date: June 7, 2010 at 9:30 a.m. (ET)** |
| Debtor. | : | |
| | : | **Re: Docket No. 64** |

**LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE MOTION PURSUANT TO SECTIONS 105(a), 363, AND 365 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, 6006, AND 9014, AND LOCAL RULES 2002-1 AND 6004-1, REQUESTING ENTRY OF (I) THE BIDDING PROCEDURES ORDER (a) APPROVING THE BIDDING PROCEDURES, (b) SCHEDULING AN AUCTION, (c) APPROVING THE BREAK-UP FEE, (d) SCHEDULING A FINAL SALE HEARING, AND (e) APPROVING THE FORM AND MANNER OF NOTICE OF AUCTION AND SALE AND NOTICE OF ASSUMPTION AND ASSIGNMENT OF CONTRACTS; AND (II) THE SALE ORDER APPROVING THE SALE OF ASSETS, INCLUDING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS, FREE AND CLEAR OF ALL LIENS, CLAIMS AND INTEREST**

The Official Committee of Unsecured Creditors (the "**Committee**") of MiddleBrook

Pharmaceuticals, Inc. ("**MiddleBrook**" or the "**Debtor**"), by its proposed undersigned counsel,

hereby files this Limited Objection (the "**Limited Objection**") to the Motion Pursuant to

Sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and

9014, and Local Rules 2002-1 and 6004-1, Requesting Entry of (I) the Bidding Procedures Order

(a) Approving the Bidding Procedures, (b) Scheduling an Auction, (c) Approving the Break-Up

Fee, (d) Scheduling a Final Sale Hearing, and (e) Approving the Form and Manner of Notice of

Auction and Sale and Notice of Assumption and Assignment of Contracts; and (II) the Sale

Order Approving the Sale of Assets, Including the Assumption and Assignment of Contracts,

---

[1]     The last four digits of the Debtor's taxpayer identification are 8264.  The Debtor's mailing address is 7 Village Circle, Suite 100, Westlake, Texas 76262.

[2]     The objection deadline concerning this matter was extended for the Committee to June 3, 2010 at 12:00 p.m.

Free and Clear of All Liens, Claims, and Interests (the "**Sale Motion**"), filed by the Debtor. In support of its Limited Objection, the Committee respectfully states as follows:

## BACKGROUND

1.      On April 30, 2010 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief (the "**Bankruptcy Case**") under chapter 11 of title 11 in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

2.      There are no scheduled secured creditors in this case, and the Debtor has not been operating under a cash collateral order or court approved budget.

3.      The Debtor has ceased its normal business and expects to conduct minimal business during the pendency of this Bankruptcy Case. The Debtor has laid off its field sales force and projects little revenue during the next thirteen weeks. Thus, whatever cash the Debtor has in this case on this date is both limited and diminishing.

4.      On May 11, 2010 (the "**Committee Formation Date**"), the Office of the United States Trustee for the District of Delaware formed the Committee in this chapter 11 case and appointed the following members to the Committee: Par Pharmaceutical, Inc., Seneca Meadows Corporate Center II LLC, McKesson Corporation, Ceph International Corporation, and PDR Network, LLC.

5.      On May 17, 2010, the Debtor filed the Sale Motion. In it, the Debtor seeks various forms of related relief including approval of bidding procedures for the sale of substantially all the assets of the Debtor free and clear of all liens, claims and encumbrances, Victory Pharma, Inc.'s ("**Victory**") status as a stalking horse bidder in exchange for a base purchase price of $17.1 million subject to higher and better bids at auction, along with a break-up fee and separate expenses to Victory pursuant to an asset purchase agreement with Victory or the

successful bidder at the auction sale, attached to the Sale Motion (the "**APA**"). The Sale Motion was filed without any Committee input.

6. Immediately upon the filing of the Sale Motion, the Committee began its due diligence review of the Sale Motion, the APA and other related documents and the relief sought in the Sale Motion.

7. On May 26, 2010, the Committee selected Invotex Group ("**Invotex**") to serve as its financial advisor.[3]

## LIMITED OBJECTION

8. The Committee does not oppose much of the relief sought by the Sale Motion, including a sale process, permitting Victory to serve as the stalking horse bidder (subject to certain modifications and clarifications), or much of the proposed APA.[4] The Committee, does however, object to certain provisions of the bid procedures to the extent that they hinder or otherwise "chill" the Debtor's ability to market and sell the assets to competing bidders for the assets and/or the equity of the Debtor. Specifically, the Committee objects to: (i) payment of a $400,000 "Break-Up Fee" to Victory in addition to payment to Victory of actual expenses of up to $150,000 as a separate "Expense Fee," which are required to be paid by the estate if the sale to Victory merely does not close by October 15, 2010; (ii) the minimum initial overbid at auction of $17,925,000, which is $825,000 above the Victory bid and the requirement that subsequent overbids to be in increments of $250,000; (iii) not permitting the auction to be modified or conducted in a way that permits acquisition of and/or through equity or alternative restructuring that differ from the current asset sale structure but which provides an equally fast yet higher

---

[3] The Committee will file an application shortly with this Court to retain Invotex as financial advisors for the Committee *nunc pro tunc* to the Committee Formation Date.

[4] The Committee's investigation continues, however, and it reserves its right to supplement its Objection prior to the final sale hearing on this matter.

dollar recovery to creditors and interest holders.  Moreover, the Committee objects to certain provisions of the proposed APA that the Committee finds ambiguous or improvident as described in greater detail below.

## ARGUMENT

9.      When a debtor attempts to sell substantially all of its assets under section 363(b) of the Bankruptcy Code instead of waiting for confirmation of a plan and the safeguards accorded by the plan process, such a sale must be closely scrutinized.  *See, e.g.*, *In re Exaersis Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008); s*ee also In re Enron Corp.*, 291 B.R. 39, 43 (S.D.N.Y. 2003); *In re Weatherly Frozen Food Group, Inc.*, 149 B.R. 480, 483-84 (Bankr. N.D. Oh. 1992).  The standard for approval of such sale is that it is in the best interest of the estate. *See, e.g.*, *In re Delaware & Hudson Railway Co.*, 124 B.R. 169 (D. Del 1991); *WBQ Partnership v. Virginia Department of Medical Assistance Services*, 189 B.R. 97 (Bankr. E.D. Va. 1995); *In re Phoenix Steel Corp.*, 82 B.R. 334 (Bankr. D. Del. 1987).  The proposed sale fails to meet this standard in several specific regards.

**A.      The Proposed Break-Up Fee, Especially When Coupled With The Separate Expense Fee, Is Improper, And Should Be Denied.**

10.      The Sale Motion seeks approval of up to $550,000 in fees to Victory, which are payable if Victory is either out-bid or merely if the proposed sale does not close by October 15, 2010.  These fees come in two forms:  $400,000 in formal "Break-Up Fees" (the "**Break-Up Fee**") and up to $150,000 for reimbursement of its expenses ("**Expense Reimbursement Fee**"). Although a payment of break-up fees to a stalking horse bidder is not uncommon, such fees also are not automatically granted and should be closely scrutinized.   Moreover, case law in the Third Circuit holds that break-up fees constitute an administrative expense under section 503(b) of the Bankruptcy Code and will not be permitted absent a showing that the payment is necessary

to preserve the value of the estate.[5] *See In re Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010); *Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.)*, 181 F.3d 527, 534-535 (3d Cir. 1999) ("The proposed break-up fee must be carefully scrutinized to insure that the Debtor's estate is not unduly burdened and that the relative rights of the parties-in-interest are protected.")  Further, courts in this jurisdiction require that there be a showing that a bidder would not bid absent the break-up fee in order to find that a break-up fee is "necessary to preserve the value of the estate."  *See Reliant Energy,* 594 F.3d at 206.  Other than the Debtor's perfunctory and unsupported statement in its Sale Motion,[6] Debtor has not attempted to make a showing to the Committee that Victory would not bid absent the payment of the $400,000 Break-Up Fee and the $150,000 Expense Reimbursement Fee.  The Court should not approve these payments absent such a showing.

11.     Further, even if the Debtor could demonstrate that Victory truly would not serve as the stalking horse without the Break-Up Fee and the Expense Reimbursement, the proposed fees are excessive and would unnecessarily chill bidding in this case.  *See In re Integrated Resources*, 147 B.R. 650, 660 (S.D.N.Y. 1992) (in assessing the incentive effect of a break-up fee, a court should determine whether the dollar amount of the fee is so substantial that it has a "chilling effect" on other prospective bidders); *In re America West Airlines,* 166 B.R. 908, 913 (Bankr. D. Ariz. 1994) (proposed break-up fee is in the best interest of the estate where, among other things, the proposed fee would not unnecessarily chill bidding).  In this circuit,

---

[5]    Although the Debtor argues that "[g]iven the Purchase Price, the Debtor, in its business judgment believes that the Break-up Fee is reasonable," (emphasis added), it concedes that the relevant standard when a debtor is in bankruptcy is not the business judgment standard, but the much more stringent administrative expense standard under section 503. *Compare* Motion, ¶ 58 *and* Motion, ¶ 55.

[6]    The Debtor simply states that "…the Break-up Fee was required by the Purchaser as a condition to its spending the significant time and expenses to negotiate and ultimately agree to the APA," Sale Motion, ¶ 57, but offers nothing further to support this bare assertion, and offers no explanation for why the Expense Reimbursement Fees is not sufficient to compensate Victory for its expense in connection with the APA or whether Victory would not have agreed to serve as the stalking horse bidder absent both the Break-Up Fee and its Expense Reimbursement Fees.

DSMDB-2796726v1

break-up fees and expense reimbursement may be approved only upon a proper showing of necessity and that the break-up fee does not excessively incentive the bidder. *See Reliant,* 594 F.3d at 206; *O'Brien Env't Energy, Inc.*, 181 F.3d at 534-535.

12.     There has been no showing that Victory's costs and expenses are such that a total break-up fee and expense reimbursement of $550,000 is necessary to incentivize Victory to become the stalking horse and perhaps lose the bid but be assured of getting its expenses paid and making some profit. On the other hand, the total amount of the Break-Up Fee and Expense Reimbursement Fee could chill the potential bids of other purchasers. Therefore, if the Court were to find that a break-up fee is warranted, the fee should be limited to $150,000, which is Victory's self-determined expense exposure in this matter. Any additional sum should not be awarded, but if some amount were to be awarded, it should be much smaller than $400,000.

## B.     The Minimum Initial Auction Overbid of $17.925 Million And The $250,000 Minimum For Each Subsequent Overbid Are Too High And Will Chill Bidding.

13.     In addition to the proposed fees noted above, certain aspects of the Debtor's proposed bid procedures are unreasonable and should not be approved. Under the proposed bidding procedures, the minimum initial overbid at auction is set at $17,925,000, $825,000 above the Victory bid. The subsequent overbids are in increments of $250,000. These amounts are unnecessarily high and would chill prospective bids. A requirement that such bidding procedures be implemented would not maximize value to the estate. *See In re Edwards*, 228 B.R. 553, 561 (Bankr. E.D.Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.")

14.     In assessing overbids, the court should make sure the overbid is not arbitrary, unreasonably high, or otherwise may chill bidding. *See, e.g.*, *In re Mama's Original Foods, Inc.*, 234 B.R. 500 (Bankr. C.D. Cal. 1999) ("How much higher an overbid must be is a matter to be

determined by the court. A minimum overbid that is too small unduly delays the proceedings. A minimum overbid that is too high, in contrast, discourages competition. The appropriate level for a minimum overbid is the minimum level that is high enough to move the procedure along toward achieving the highest bid.")

15. The proposed base purchase from Victory is $17,100,000. This amount is subject to certain additions and subtractions as set forth under the proposed APA. While such netting may result in a higher purchase price from Victory, such an increase is unclear. Regardless of what that netting may produce, the proposed bidding procedures, unless changed, will require any interested party to start the bidding with a base price at $17,925,000, or $825,000 more than the $17,100,000 Victory bid. This overbid requirement is excessive, even if the break-up fees is reduced (as should be the case), and certainly too high if they are approved at the proposed $550,000.

16. Based upon the facts of the case, the Committee avers that the overbid be set at $100,000 greater than the Victory bid of $17,100,000 plus any awarded break-up fees. Similarly, any subsequent overbid should be in increments of $100,000.

**C.    The Bidding Procedures Should Be Modified To Permit Greater Flexibility In Conducting The Auction/Sale Process And To Permit For A Potential Equity Acquisition Or Restructuring Without Additional Case Delay.**

17. Bidding procedures should be designed to encourage a competitive bidding process and to maximize value. *See, e.g.*, *Edwards*, 228 B.R. at 561. Here, the Committee desires the bidding procedures to be permitted to be modified in order permit alternative "bids" in the form of an offer for the purchase of equity, or in the form of an equity restructuring (so long as the bid provides for immediate cash payment above that which would be received from the Victory proposal). The Committee raises this point as it understands that certain equity

holders have been in discussions with the Debtor to refinance the enterprise.[7] In order to encourage such refinancing "bids" without slowing down the existing sale process, unduly extending the case and in turn, increasing the prospect of greater administrative expenses, the Committee avers that bidding procedures should be appropriately modified.

**D.**      **The APA Requires Clarifications And Modifications.**

18.    There are certain aspects of the proposed APA that are ambiguous and problematic and should, therefore, be modified.  These provisions include the following:

19.    <u>Need For Limited Remedies Provision</u>.  The APA does not contain a provision setting forth or limiting exactly what remedies, if any, may exist to the parties and under what circumstances those remedies would be available.  If the intention of the parties was to limit their remedies to the four corners of the APA, it should say so.  The Committee believes such a provision is needed for all concerned to understand, what, if any, potential offsets or reductions may exist against the purchase price, and to be assured that once closing occurs, there are no contingent, unliquidated or unknown liabilities that might affect recoveries to unsecured creditors.

20.    <u>Clarification of Certain Definitions And Provisions</u>. Certain definitions require clarification in order for the Committee to understand them, how they may affect the net recovery in this case, and ultimately, whether they are appropriate.  These provisions include:

o    Paragraph 1.3(f) has Product Liabilities in the Assumed Liabilities but Paragraph 1.4(a) has Product Liabilities included as an Excluded Liability. Clearly only one can be correct. The Debtor needs to identify and clarify this ambiguity and explain the legal and economic effect of the resolution. Upon such clarification and explanation, the Committee reserves its right to object.

---

[7]    Notwithstanding the statements of a tiny minority of equity holders, there is no assurance that unsecured creditors will be receiving 100% recovery (with interest) on all allowed claims.  In fact, the Debtor recognizes that even under the Victory bid, unsecured creditors will not be paid in full if at least one known contingent claim of $11 million is allowed.  Further, no bar date has been set in this case and thus it is unclear what additional claims may be asserted and allowed.

DSMDB-2796726v1

o        Paragraph 1.4(f) Excluded Liabilities, has an exclusion for "Pre-Closing Distribution Services Obligations" and lists several companies.  It is unclear whether or not this is the same liability referred to in paragraph 5.11(b) as "Wholesaler credit Balance Payments," or the "billings" referred to in 5.12.  Because the Debtor has multiple relationships with distribution companies including co-pay coupons, discounts and other programs, it is unclear what expenses are being referred to and in turn, how this may affect the value received.  Once that is clarified, the Committee may object further as warranted.

o        Paragraph 1.4(h) requires the Debtor to pay cure amounts under the Lilly Agreement (the license for Keflex) other than with respect to "Assumed Keflex Royalty Liabilities."  Such other cure amounts, if any, have not been provided, and with out doing so it is impossible to determine the economic value of the proposed transaction.

o        Paragraph 1.4(j) – cure costs – are not specified.  Nor are the "Purchaser Cure Amounts" in paragraph 5.2 specified.

o        Paragraph 5.4 (b)(i) of the APA describes a requirement of Victory that they continue to operate in the "ordinary course" and in paragraph 5.8 that they endeavor to find a new manufacturer of Keflex.  These provisions cost the Debtor money, and unless better determined, could potentially operate as a trip wire to permit Victory to exit the transaction.  Specifically, it is questionable whether the Debtor is or can be expected to operate in the "ordinary course" of business given the fact that, among other things, the company just finished laying off the sales force and most other employees.

21.        The Committee also recommends the following changes to the following paragraphs in the APA.  For ease, these proposed changes are contained in redline form below:

3.8 Intellectual Property

(a)        Schedule 3.8(a)(i) sets forth all Patents licensed, owned or Controlled by the Seller, including those Patents (A) used or held for use in the operation of any Business or related to any Product, or (B) relating to (x) Moxatag or its use or manufacture, (y) Keflex or its use or manufacture or (z) the Seller's PULSYS technology.  Schedule 3.8(a)(ii) sets forth all registered Product Copyrights, Product Marks, Product Trade Dress and Product Domain Names licensed, owned or Controlled by Seller.  Except as set forth in Schedule 3.8(a)(iii), (1) no Person other than the Seller has any ownership interest in any Product Intellectual Property in which the Seller has an ownership interest, (2) the Seller Controls all material Product Intellectual Property, (3) except for any licenses granted in the ordinary course of business, neither the Seller nor any of its Affiliates has granted any licenses to the Product Intellectual Property to third parties, and (4) neither the Seller nor any of its Affiliates, nor to the Seller's knowledge, any other Person, is party to any agreements with third parties that materially limit or restrict use of the material Product Intellectual Property or require any payments for their use.

(b)        Except as set forth on Schedule 3.8(b), none of the Product Intellectual Property is the subject of:  (A) any pending adverse Order or Contract restricting (x) its use in connection

DSMDB-2796726v1

with any Product or any Business or (y) assignment or license thereof by the Seller; (B) to the Seller's Knowledge any threatened , or pending Suit; (C) any request for royalty payments or offers for licenses to Intellectual Property that would relate to any Product or any Business, in each case made in writing or, to the Seller's Knowledge, made otherwise, or (D) to the Seller's Knowledge, any actual or threatened inventorship challenges, interferences declared or assertions of invalidity with respect to any Patents included in the Product Intellectual Property.

(c)    Except as set forth on Schedule 3.8(c), neither the Seller nor any of its Affiliates has received written notice of a claim that the use or sale of the Product or the use of the Product Intellectual Property by or behalf of the Seller infringe any valid intellectual property right of any third party.

(d)    All issuance, renewal, maintenance and other payments that are or have become due with respect to the Product Intellectual Property that is owned by the Seller have been timely paid by or on behalf of the Seller, except as would not reasonably be expected to have a Material Adverse Effect

22.    The Committee believes the following clarification to the definition of

Intellectual Property should be utilized, which is designed to avoid duplication of terms and

ambiguities:

"Intellectual Property" means, collectively: (a) all inventions (whether or not reduced to practice), and all improvements thereto, and all Patents; (b) all Trademarks; (c) all works of authorship, all copyrights and moral rights relating thereto and all applications, registrations and renewals in connection therewith (including software); (d) all mask works and all applications, registrations and renewals in connection therewith; (e) all trade secrets and confidential business information, technology, discoveries, improvements, specifications, designs, formulae, techniques, technical data and manuals, methods and processes, and all other proprietary information and data; (f) all internet domain names and registrations therefor; (g) all rights under Section 365(a) of the Bankruptcy Code arising from or relating to the foregoing; and all modifications, improvements and derivatives of each of the foregoing; and (h) the right to seek past, present and future damages, including with respect to third-party infringement and misappropriation.

Exhibit A to APA, Definitions.

<div style="float:right; border:1px solid red;">

**Deleted:** Suit; (C) any

**Deleted:** D

**Deleted:** E

**Deleted:** , all goodwill associated therewith, and renewals or extensions in connection therewith

**Deleted:** Software

**Deleted:** (including confidential ideas, research and development, know how, show how, methods, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), invention disclosures,

**Deleted:** (h) all copies and tangible embodiments of each of the foregoing (in whatever form or medium)

**Deleted:** i

</div>

**RESERVATION OF RIGHTS**

23.      The Committee is in the process of conducting additional due diligence and

discovery with respect to the Sale Motion and the relief requested therein.  Therefore, the

Committee reserves the right to modify or enhance its Objection at the hearing on this matter


**CONCLUSION**

24.      For the foregoing reasons, the Committee respectfully requests that the Court

enter an order:  (i) denying the Sale Motion to the extent not modified in accordance with the

concerns raised in this Objection; and (ii) granting the Committee such other and further relief as

the Court deems just and proper.

Dated: June 3, 2010                                      BAYARD, P.A.
       Wilmington, Delaware

                                       /s/  GianClaudio Finizio
                                       Neil B. Glassman (No. 2087)
                                       GianClaudio Finizio (No. 4253)
                                       222 Delaware Avenue, 9th floor
                                       Wilmington, Delaware 19801
                                       Tel.: (302) 655-5000
                                       Fax: (302) 658-6395


                                         - and -

                                       Sam J. Alberts (*admitted pro hac vice*)
                                       Mary Kim (*admitted pro hac vice*)
                                       DICKSTEIN SHAPIRO LLP
                                       1825 Eye Street, N.W.
                                       Washington, D.C.  20006
                                       Tel: (202) 420-3616
                                       Fax:  (202) 379-9374

                                       *Proposed Counsel for the Official Committee of*
                                       *Unsecured Creditors*

DSMDB-2796726v1