## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MIDDLEBROOK PHARMACEUTICALS, INC., | Case No. 10-11485 (MFW) |
| Debtor. | **D.I. Nos. 429 and 478** |

## LIMITED OBJECTION OF OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS TO CONFIRMATION OF THE DEBTOR'S PLAN OF LIQUIDATION

The Official Committee of Equity Security Holders (the "Equity Committee") objects to the confirmation of the Plan of Liquidation proposed by MiddleBrook Pharmaceuticals, Inc. (the "Debtor") dated November 4, 2010, and in support thereof, the Equity Committee states as follows:

## BACKGROUND

1. On April 30, 2010 (the "Petition Date"), the above-captioned debtor and debtor-in-possession (the "Debtor") commenced this case (the "Chapter 11 Case") by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2. On June 23, 2010, the United States Trustee for the District of Delaware (the "United States Trustee") appointed the five (5) member Equity Committee[1] pursuant to section 1102(a)(1) of the Bankruptcy Code [Docket No. 154].

3. The Equity Committee has standing to be heard pursuant to 11 U.S.C. § 1103.

### The Management Employee Incentive Plan

4. On May 17, 2010, the Debtor filed a Motion for an Order (i) Approving the MiddleBrook Employee Incentive Plan and (ii) Authorizing Payments Thereunder Pursuant to Sections 105(a), 363(b) and 503(c) of the Bankruptcy Code [Docket No. 63] (the "MEIP

---

[1] On or about July 30, 2010, one of the Committee members, Junfeng Huang, resigned from the Committee.

Motion") by and through which the Debtor sought authority to pay thirteen (13) people an aggregate in excess of $2.3 million beyond their normal salaries. Specifically, by and through the MEIP, the Debtor sought to allow six (6) Management Participants (as that term is defined in the MEIP Motion) as much as an additional $2,150,000, and the seven (7) Non-Management Participants (as that term is defined in the MEIP Motion) as much as an additional $190,723. On June 2, 2010, the ad hoc committee of equity security holders (the "Ad Hoc Committee") filed an objection to the MEIP Motion asserting that the incentive plan, as structured, was really a de facto retention bonus [Docket No. 98].

5.      Ultimately, the Debtor and the Ad Hoc Committee reached an agreement that permitted the Management Participants and the Non-Management Participants to receive certain payments triggered by the amount of distribution to be received by equity security holders. On July 12, 2010, the Bankruptcy Court entered an Order approving the MEIP Motion, as modified [Docket No. 193].

### The Sale of Substantially All of the Debtor's Assets

6.      On May 17, 2010, the Debtor filed a Motion Pursuant to Sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rules 2002-1 and 6004-1, Requesting Entry of (I) the Bidding Procedures Order (a) Approving the Bidding Procedures, (b) Scheduling an Auction, (c) Approving the Break-up Fee, (d) Scheduling a Final Sale Hearing, and (e) Approving the Form and Manner of Notice of Auction and Sale and Notice of Assumption and Assignment of Contracts; and (II) the Sale Order Approving the Sale of Assets, Including the Assumption and Assignment of Contracts, Free and Clear of All Liens, Claims, and Interests [Docket No. 64] (the "Sale Motion"). On June 2, 2010, the Ad Hoc Committee filed a Limited Objection to the Sale Motion in which it objected

2

to, among other things, the amount of the proposed break-up fee and the amount of the bid increments. [Docket No. 98]. On June 9, 2010, the Court entered an Order granting the motion, which included certain of the modifications requested by the Ad Hoc Committee [Docket No. 136].

7.  Unfortunately, the Debtor did not receive any additional bids prior to the Bid Deadline,[2] and on July 28, 2010, the Court entered an Order approving the sale of substantially all of the Debtor's assets (the "Sale") [Docket No. 245].

8.  After the consummation of the Sale on or about July 30, 2010, the balance of actions to be taken in the bankruptcy case was selling certain de minimis assets, objecting to claims, including the claim of Par Pharmaceuticals,[3] and negotiating a plan of liquidation.

**The Plan and Plan Supplement**

9.  On November 4, 2010, the Debtor filed the disclosure statement [Docket No. 430] (the "Disclosure Statement") and the Plan [Docket No. 429] (as supplemented, the "Plan"). On November 29, 2010, the Debtor filed a supplement to the Plan [Docket No. 478]. Among other things, the Plan provides:

> 5.6  Plan Administrator. Prior to the Confirmation Date, the Debtor, in consultation with the Creditors' Committee and the Equity Committee, will designate a person or entity to serve as the Plan Administrator . . . .

> 5.8  Rights, Powers, and Duties of the Post-Effective Date Debtor and the Plan Administrator. The Post-Effective Date Debtor will retain and have all of the rights, powers, and duties necessary to carry out its responsibilities under this Plan, under the exclusive control and direction of the Plan Administrator. Additionally, the Plan Administrator may bring or otherwise pursue all claims and Causes of Action on behalf of the Debtor, the Post-Effective Date Debtor, the

---

[2]  The Court received a late request to adjourn the auction and sale hearing by Equity Group Investments, LLC ("EGI") so that it could make a bid for the assets, however, the Court denied EGI's request.

[3]  By agreement between the Debtor, the Equity Committee and Par Pharmaceutical, Inc., the amount of Par's claim will be decided at arbitration which will be concluded by January 31, 2011. Par's claim shall be subject to a cap of $3.5 million. On September 30, 2010, the Court entered an Order approving the stipulation [Docket No. 379].

2892458/1

Estate and, if implemented, the Liquidating Trust, that could otherwise be brought by a trustee or an examiner appointed under the Bankruptcy Code, that are not otherwise released by this Plan or the Confirmation Order. . . .

5.14   Plan Committee Option.  The Debtor, in consultation with the Creditors' Committee and the Equity Committee, may elect to implement the Plan Committee to oversee the Plan Administrator in the performance of his or her duties.  If such option is elected, the Debtor shall so specify in the Plan Supplement.  In such event, the Plan Committee will be appointed on the Effective Date and shall consist of (i) one member designated by the Debtor; and (ii) one member designated by the Equity Committee representing the Holders of Interests; and (iii) one member designated by the Creditors' Committee, except that the member designated by the Creditors' Committee may not be a creditor holding a Disputed Claim.  The Plan Committee shall be governed by the Plan Committee Agreement.  The Plan Committee's rights, powers and duties are limited to those set forth in the Plan Committee Agreement.

6.13   Contingent and Unliquidated Claims.  As soon as is practicable, the Plan Administrator shall take action seeking the estimation for purposes of distribution of contingent or unliquidated Claims filed against the Debtor, the Post-Effective Date Debtor, or the Estate pursuant to Section 502(c) of the Bankruptcy Code.  Upon determination of the estimated amount of such contingent or unliquidated claim, the Plan Administrator shall maintain Cash in an amount equal to the amount of such estimated claim in a reserve account until such claims are resolved in full or in part, either by (i) agreement between counsel to the Debtor or the Plan Administrator and the Holder of the Claim or (ii) by Final Order.  Notwithstanding the foregoing, with respect to a Claim for indemnity by the Debtor's current or former directors or officers, the Plan Administrator shall maintain Cash in a reserve account on account of such Claims only in an amount equal to the aggregate deductible payment(s) for the Debtor's applicable insurance policies

9.3   Injunction Related to Exculpation.  All Persons that have held, hold or may hold any claims exculpated pursuant to Section 9.2 will be permanently enjoined from taking any of the following actions against any Released Party[4] or its property on account of such exculpated liabilities:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind; (ii) enforcing, levying, attaching, collecting or

---

[4]   Plan Section 1.68, titled "Released Parties" defines Released Parties as "(i) the Debtor, (ii) the present and former members of the Debtor's Board of Directors who were serving in such capacity on or after the Petition Date, (iii) the present and former officers and employees of the Debtor who were serving in such capacity on or after the Petition Date, (iv) the Creditors' Committee and the Equity Committee and its past and present members (but only in their capacity as members of the Creditors' Committee or the Equity Committee), and (v) any attorneys, financial advisors, investment bankers, accountants, consultants, or other professionals of the parties described in clauses (i) through (iv) hereof; provided, however, that such Released Parties shall only include those that provided services related to the Debtor, the Bankruptcy Case, the Plan, or the transactions contemplated by this Plan." [Emphasis Added].

4

otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree or order; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien; (iv) except as provided herein, asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due a Released Party; and (v) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of this Plan.

9.4     Survival of Indemnification Obligations. Except as set forth in this Plan or in the Confirmation Order, the obligations of the Debtor to indemnify any past and present directors, officers, agents, employees and representatives, pursuant to certificates or articles of incorporation, by-laws, contracts and/or applicable statutes, in respect of all actions, suits and proceedings against any of such officers, directors, agents, employees, and representatives, shall not be discharged or Impaired by, and shall survive, confirmation or consummation of this Plan. To the extent not already obtained, the Debtor shall purchase and maintain a tail policy for the director and officer insurance providing coverage for directors and officers for a period of time as designated in the Plan Supplement after the Effective Date insuring such parties in respect of any claims, demands, suits, causes of action, or proceedings against such directors and officers based upon any act or omission related to such directors' and officers' service with, for, or on behalf of the Debtor in an amount to be designated in the Plan Supplement, and in at least the scope as currently maintained by the Debtor.

(Emphasis added).

9.5     Releases by the Debtor. As of the Effective Date, the Debtor shall be deemed to have forever released, waived and discharged all claims, demands, debts, rights, causes of action or liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise against any of the Released Parties, that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to any of [sic] the Debtor, the Bankruptcy Case, this Plan or the Disclosure Statement; provided, that, nothing herein shall release any of such parties from their obligations under the Plan or the Plan Administrator Agreement or, if implemented, the Liquidating Trust Agreement, and provided further that nothing herein shall release any claim related to an act or omission that is determined by a Final Order to have constituted willful misconduct or gross negligence.

(Emphasis added).

9.6     Discharge of Claims and Termination of Interests. Except as otherwise provided herein or in the Confirmation Order, all consideration distributed under

this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and Interests of any nature whatsoever against the Debtor or its Estate, assets, properties or interest in property, and regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Interests. Upon the Effective Date, the Debtor shall be deemed discharged and released under Section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims and Interests, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Section 502(g), 502(h) or 502(i) of the Bankruptcy Code, and the Interests.

9.7 <u>Injunction</u>. Except as otherwise provided in this Plan or the Confirmation Order, from and after the Effective Date all Persons who have held, hold or may hold Claims against or Interests in the Debtor, are (i) permanently enjoined from taking any of the following actions against the Estate or its property, on account of any such Claims or Interests and (ii) permanently enjoined from taking any of the following actions against any of the Debtor, the Post-Effective Date Debtor, the Plan Administrator or their property on account of such Claims or Interests: (A) commencing or continuing, in any manner or in any place, any action, or other proceeding; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting or enforcing any lien or encumbrance; (D) asserting any right of setoff, subrogation or recoupment of any kind and (E) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan; <u>provided</u>, <u>however</u>, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of this Plan.

10. On November 29, 2010, the Debtor filed the Plan Supplement which included a Plan Administrator Agreement pursuant to which Ronald Glass of GlassRatner Advisory & Capital Group, LLC would serve as Plan Administrator of the estate.

11. Plan Section 5.14, titled "Plan Committee Option," together with Section 2.6 of the Plan Supplement creates an oversight committee (the "<u>Plan Committee</u>") which is comprised of three members. Under the Plan, the Plan Committee is charged with the duty of overseeing the actions of the Plan Administrator in carrying out the Plan Administrator's duties under the Plan and has standing to object to any action taken by the Plan Administrator or seek to enforce the Plan Administrator's responsibilities under the Plan. As more specifically set

2892458/1

forth in Section 5.14 of the Plan Supplement, the Debtor, the Creditors Committee, and the Equity Committee may each name one person to the Plan Committee.

## The Plan and Disclosure Stipulation and the Insurance Tail

12.    Prior to November 5, 2010, the Debtor, Creditors Committee, and Equity Committee negotiated a process by which the Debtor would file a disclosure statement and plan of liquidation, both of which would be considered by the Court at the same hearing. On November 5, 2010, the Debtor submitted a Stipulation Between the Debtor, the Creditors' Committee and the Equity Committee With Respect to (a) the Form and Manner of Notice of Disclosure Statement and Confirmation Hearing, (b) the Record Date, and (c) the Deadline and Procedures for Filing Objections (the "Voting Stipulation") to the Court under a certification of counsel [Docket No. 432]. The Stipulation, among other things, agreed upon the form and notice of the Disclosure Statement and confirmation hearing and the voting and objection procedures for the Plan and Disclosure Statement. On November 8, 2010, the Bankruptcy Court entered an Order approving the Voting Stipulation [Docket No. 434].

13.    On November 18, 2010, the Debtor filed an emergency motion for authority to purchase tail coverage for its existing directors and officers policies [Docket No. 450] (the "Emergency Insurance Motion"), by and through which it sought authority to purchase a six-year tail to the director and officer insurance at a cost of $586,000 to the estate. The Equity Committee filed a limited objection to the Emergency Insurance Motion [Docket No. 466] because it believed that, at a minimum, purchasing a six-year tail to the insurance was unnecessary in light of the (stipulated) fact that the bankruptcy case would be fully administered and closed no later than two years after the Effective Date of the Plan. Further, the Equity Committee asserted that, like the proposed releases and the MEIP, the relief sought by the

Emergency Insurance Motion – at least in part – was designed only to benefit the Debtor's current and former directors and officers (the "Insiders"). The Court overruled the Equity Committee's objection, and entered an Order authorizing the Debtor to spend up to $586,000 to purchase a tail for the Debtor's directors and officers insurance policy [Docket No. 472]. Upon information and belief, on November 23, 2010, the Debtor purchased the six-year tail.

## BASIS FOR LIMITED OBJECTION

14.     The Equity Committee files this Limited Objection because the Plan: (i) seeks to impermissibly grant releases to its current and former directors and officers for pre-petition acts, (ii) names Ronald Glass as Plan Administrator, rather than the choice of the Equity Committee; (iii) creates the Plan Committee which names one designee by the Debtor, one by the Creditors Committee and one by the Equity Committee, and (iv) requires that the Plan Administrator reserve $500,000 for the Insiders' indemnification claims set forth in Section 6.13 of the Plan without making a finding as to allowance under Section 502(c) of the Bankruptcy Code.

### A.      The Proposed Releases of the Insiders Sought under the Plan are Impermissible.

15.     By and through the Plan, the Debtor seeks to, *inter alia*, grant a broad release of claims that the Debtor may hold against certain of the Debtor's directors and officers for not only postpetition acts and omissions, but also all claims for prepetition acts and omissions, other than acts or omissions that are determined by a Final Order to have constituted willful misconduct or gross negligence.[5]  Simply stated, the proposed releases are contrary to bankruptcy law and the Released Parties should be given releases for only postpetition claims

---

[5]     Such releases, when taken together with Sections 9.3, 9.6, and 9.7, affect the rights of equityholders to bring derivative claims on behalf of the Debtor.

2892458/1

and causes of action, other than such acts or omissions that are the product of willful misconduct or gross negligence.

16.     Until the Supreme Court states otherwise or the Third Circuit reverses itself, the final word on plan releases to non-debtors in the Third Circuit is <u>Gillman v. Continental Airlines</u> (<u>In re Continental Airlines</u>), 203 F.3d 203 (3d Cir. 2000).  In <u>Continental</u>, the debtors filed a plan of reorganization which sought to release and permanently enjoin claims, including certain shareholders' class action claims against the Debtor's directors and officers.  <u>Id</u>. at 206-07.  Specifically, in <u>Continental</u>, the debtors sought the following releases in the plan:

> 12.4    Release of Certain Claims and Actions (a) On the Effective Date, in order to further the rehabilitation of the Debtors, any and all claims and causes of action, now existing or hereafter arising, against any present or former officer or director of any of the Debtors or any of the Debtors' professional advisors arising out of or related to such Person's actions or omissions to act in his or her capacity as an officer or director of the Debtors or as a member of any committee, or as a fiduciary of any pension or employee benefit plan, or as such an advisor, relating to the Debtors at any time through the Confirmation Date, are irrevocably waived, released and relinquished, and each of the Debtors, its Creditors, and Equity Holders and all other persons is enjoined from asserting any such claim or cause of action in any court or forum....

> (b)(ii) Various claims, including the Stockholder Actions, also have been asserted or threatened against certain present or former directors of the Debtors including claims arising out of intercompany transactions that occurred and decisions that were made prior to December 3, 1990 . . . The Debtors have maintained a directors and officers liability insurance policy and the insurer under such policy, following approval by the Bankruptcy Court on December 1, 1992, paid $5 million in final settlement in final settlement of all claims (excepting only the L/S Claims). The Confirmation Order shall . . . provide that all Persons shall thenceforth be permanently enjoined, stayed and restrained from pursuing or prosecuting any such actions against any person so released.

<u>Id</u>.  Certain of the <u>Continental</u> debtors' shareholders filed an objection to the plan because it sought to release all claims held by the shareholders against the directors and officers who were each third party non-debtors.  <u>Id</u>. at 207.  The Bankruptcy Court confirmed the plan, including the releases sought therein, and the shareholders appealed.  After the District Court affirmed the

confirmation order, the Third Circuit reversed holding, among other things, the release of the shareholder claims against the directors and officers was not supported by sufficient evidentiary and legal basis, and violated the Bankruptcy Code by relieving the non-debtor parties of liabilities. Id. at 217.

17.     As an initial matter, the Court of Appeals stated that "[t]he Bankruptcy Code does not explicitly authorize the release and permanent injunction of claims against non-debtors except in one instance not applicable here." Continental, 203 F.3d at 211. Further, the Third Circuit stated that, although "[s]ection 105(a) of the Bankruptcy Code supplements courts' specifically enumerated bankruptcy powers by authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code," the powers bestowed pursuant to § 105(a) are "limited," and do not "create substantive rights that would otherwise be unavailable under the Bankruptcy Code." Continental, 203 F.3d at 211 (quoting United States v. Pepperman, 976 F.2d 123, 131 (3d Cir. 1992); Internal Revenue Serv. v. Kaplan, 104 F.3d 589, 597 (3d Cir. 1997); Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988) (court's equitable powers "must and can only be exercised within the confines of the Bankruptcy Code")).

18.     Ultimately and importantly, the Third Circuit's decision to reverse the District Court's affirmance of the releases to non-debtor parties was based upon the need for both fairness and necessity. Continental, 203 F.3d at 214. In approving non-debtor releases and permanent injunctions, the Third Circuit found that courts must make "specific factual findings to support" their conclusions that the releases are both fair and necessary. Id.; see also In re Genesis Health Ventures, 266 B.R. 591, 603 (Bankr. D. Del. 2001) (observing that the Third Circuit "held open the prospect that 'there are circumstances under which [it] might validate a nonconsensual release that is both necessary and given in exchange for fair consideration"),

appeal dismissed on unrelated grounds, 280 B.R. 339 (D. Del. 2002). Further, the approval of non-debtor releases and permanent injunctions is to be reserved for "extraordinary cases[.]" Continental, 203 F.3d at 212. With this framework in mind, this Court needs to evaluate whether the proposed releases sought in the Plan are both fair and necessary.

## I. The proposed releases are not fair.

19.     In evaluating the "fairness" of proposed releases, the primary inquiry is whether the releases "were given in exchange for reasonable consideration." Continental, 203 F.3d at 212. The phrase "reasonable consideration" has not been defined by courts. However, courts have consistently held that "reasonable consideration" requires a "substantial contribution of assets to the reorganization," and does not include services provided by directors and officers who have been otherwise compensated for their efforts. Genesis, 266 B.R. at 606; see also Continental, 203 F.3d at 215-17 (refusing to approve plan where, inter alia, the debtors "have not disputed Plaintiff's contention that Plaintiffs received no consideration in exchange for having their lawsuits permanently enjoined); In re AOV Indus., Inc., 792 F.2d 1140, 1154 (D.C. Cir. 1986) (holding that a plan provision releasing the liabilities of non-debtors was unfair because the plan did not provide additional compensation to a creditor whose claim against a non-debtor was being released).

20.     In Genesis, the Court was unimpressed by the debtor's argument that the directors and officers "contributed" to the reorganization by virtue of the efforts they dedicated to the reorganization process. 266 B.R. at 606. Reasoning that, although "the officers and directors of the debtors no doubt made meaningful contribution[s] to the reorganization by designing and implementing the operational restructuring of the companies, and negotiating the financial restructuring with parties in interest," the Court recognized that they were "otherwise

11

compensated for their contributions, and the management functions they performed do not constitute contributions of 'assets' of the reorganization," and therefore the directors and officers had not made the type of substantial contribution required to establish fair consideration. Id.

21.     Similarly, the Debtor's directors and officers cannot claim to have provided a substantial contribution of assets to the reorganization. The Released Parties have provided absolutely no financial contribution to the Debtor's reorganization. To the contrary, in addition to receiving their regular compensation and asserting claims for their severance (for which they are receiving 100%), some or all of the Released Parties have sought and may receive significant proceeds from the management incentive plan. Further, the Insiders have sought and received authority to have the estate bear the cost of a six-year insurance tail, where at least some portion of which is for their exclusive benefit.

22.     Thus, there can be no doubt that the proposed releases of the Released Parties are not the result of any consideration, let alone the "fair consideration" required for the releases sought under the Plan.

## II.     The proposed releases are not necessary.

23.     Even if the Released Parties had provided fair consideration in exchange for the proposed releases, the Releases are by no means necessary for the successful reorganization of the Debtor. "[T]he question of necessity requires demonstration that the success of the debtors' reorganization bears a relationship to the release of the non-consensual parties, and that the releasees have provided a critical financial contribution to the debtors' plan that is necessary to make the plan feasible in exchange for receiving a release of liability." Genesis, 266 B.R. at 607 (citing Continental, 203 F.3d at 215). Further emphasizing the significance of providing a financial contribution in exchange for releases, the inquiry evaluates not only whether a

12

financial contribution was made by the released parties, but the "critical" nature of such contribution to the success of the plan. In addition, courts consider the effect existing and anticipated lawsuits against the releasees may have on the effective reorganization of a debtor, with an eye towards whether, "absent such an injunction in favor of [the releasees], the reorganization has little likelihood of success." Continental, 203 F.3d at 215.

24.     Here, not only have the Released Parties made no financial contribution to the Debtor's plan, but the case is not a reorganization. Even if the factors used to consider the effect on a debtor's reorganization are applied to the potential effect elimination of the releases would have on the Debtor's plan of liquidation, there is no indication that the Releases are necessary to an effective liquidation of the Debtor's remaining assets.

25.     The Debtor's only argument that the Releases are necessary is based upon its obligation to indemnify the Released Parties in the event a lawsuit is filed against them. However, the Debtor's indemnification obligation is insufficient to establish the necessity of the Releases. See, e.g., Continental, 203 F.3d at 215 ("We also take issue with the District Court's unsupported conclusion that the Continental debtors' obligation to indemnify its D&O's transforms the release and permanent injunction of Plaintiffs' claims against non-debtor D&O defendants into a 'key element' of the Continental debtors' reorganization."). In fact, even if the Debtor were to reorganize and wished to retain its current directors and officers post-confirmation, the enticement the Releases would provide to remain with the Debtor is insufficient to establish the necessity of releasing such parties from liability. See, e.g., Genesis, 266 B.R. at 607 (holding that "there can be no conclusion drawn that absent such an injunction in favor of debtors' officers, directors and employees, the reorganization has little likelihood of success," even though the debtors in Genesis wished to retain their current management

13

subsequent to the reorganization). Thus, there is no indication that the Releases are in any way necessary to the Debtor's liquidation.

26.     This is not an extraordinary case. Rather, it is a common liquidation and there is no need and no justification for the extraordinary non-debtor releases sought by and through the Plan. For the foregoing reasons, the Equity Committee respectfully submits that the Court should strike any provision in the Plan and proposed confirmation order which would release the Released Parties from any claims arising prior to the petition date.

**B.      The Equity Committee, Not the Debtor, Should have the Exclusive Right to Name the Plan Administrator.**

27.     Courts throughout the land, including the Court of Appeals for the Third Circuit, have repeatedly stated the importance of the integrity of the bankruptcy process. See, e.g., In re Seven Fields Dev. Corp., 505 F.3d 237, 262 (3d Cir. 2007) ("Nothing is more important than the integrity of the bankruptcy process...[T]he integrity of the process goes to the heart of the administration of a bankruptcy case."); In re Brown, 354 B.R. 591, 594-95 (D.R.I. 2006) ("In general terms, under the Bankruptcy Code, the bankruptcy court has 'broad, well-established powers...to preserve the integrity of the reorganization process.'") (citations omitted); In re Commercial Fin. Servs., Inc., 247 B.R. 828, 843-44 (Bankr. N.D. Okla. 2000) ("This Court has a duty to protect the integrity of the bankruptcy process[.]"). Even beyond the actual integrity, it is fundamental that there not be any appearance of impropriety which would jeopardize confidence in the bankruptcy process. See, e.g., In re Ira Haupt & Co., 361 F.2d 164, 168 (2d Cir. 1966) ("The conduct of bankruptcy proceedings not only should be right but must seem right"); In re Granite Partners, 219 B.R. 22, 38 (Bankr. S.D.N.Y. 1998) ("Bankruptcy is concerned as much with appearances as with reality"). Permitting the Debtor to nominate the

2892458/1

person charged with investigating and pursuing possible claims against the Insiders threatens the perceived integrity of the bankruptcy process.

28.     There are only a few actions left to be taken on behalf of the estate in this bankruptcy case. There are no avoidance actions, and to the best of the Equity Committee's knowledge, the Debtor has already filed all of the objections to proofs of claim that it believes are necessary. Aside from destroying the Debtor's books and records, preparing and filing tax returns for the Debtor, estimating certain contingent claims, and distributing estate assets to creditors and equity holders, the Plan Administrator will need to prosecute the pending objection to the Debtor's landlord's proofs of claim, and arbitrate Par's claim (which is scheduled to conclude by the end of January 2011). The only other actions to be undertaken are investigating and pursuing any claims against the Debtor's former and current directors and officers, to the extent that such claims exist.

29.     As more fully set forth hereinabove, the proposed releases sought by the Plan are inappropriate and contrary to bankruptcy law. Similarly, it is important to have a Plan Administrator who will bring any such claims, to the extent that they are warranted. Because the Plan Administrator will necessarily have to evaluate and pursue any claims against the Insiders (to the extent any claims exist), the Equity Committee - not the Debtor - should be entitled to name the Plan Administrator.[6] Simply stated, whether or not the Court approves the proposed releases to Insiders, the Plan Administrator – as a matter of his fiduciary duties - will be required to investigate all potential claims against the Insiders. Because it is those same

---

[6]     The Equity Committee has proposed to the Debtor that any of the three of the panel Chapter 7 trustees serve as Plan Administrator because each has significant experience winding down liquidated estates in this jurisdiction, and each is local and therefore will not need to travel to attend hearings before the Court. The Debtor has refused to nominate any of the three as Plan Administrator. If the Court permits the Equity Committee to name the Plan Administrator, it will select Alfred T. Giuliano.

Insiders who have proposed the Plan Administrator, it is inconceivable that the Court would permit the Debtor to name the fox to guard the henhouse.

30. Even if the Debtor can prove that there is no direct or indirect relationship between or among the Insiders and the Plan Administrator, this Court should be mindful that the Debtor's selection of the Plan Administrator (which again, in reality, was made by the Insiders) affects the perceived integrity of the bankruptcy process.

31. Furthermore, even if the Court grants the releases to the Insiders, as currently proposed, the Plan Administrator will still have potential claims against the Insiders for prepetition and postpetition acts or omissions which were the result of either willful misconduct or gross negligence. Again, it is incomprehensible that the Debtor believes that its Plan Administrator would not at least have a perceived bias - if not some actual bias – to restrain from pursuing possible assets of the estate.

32. By way of example, assuming that the Debtor's proposed Plan Administrator was appointed, if the Plan Committee were dissatisfied with the Plan Administrator's investigation and failure to bring an action for any unreleased claims, the Plan Committee would need to file a motion[7] to require that the Plan Administrator bring an action against the Insiders. Even if the Court were to enter an Order requiring that the Plan Administrator commence whatever action was necessary, the Plan Administrator could file such action, but not pursue it with the vigor that is required. For example, the Plan Administrator could file suit and accept the first offer

---

[7]    It is worth noting that the Plan Supplement provides that the Plan Committee, but not the individual Plan Committee members, may have counsel paid by the estate only upon application to the Court. Individual members of the Plan Committee would have to retain counsel at their own expense.

This is important because, pursuant to Section 1.2 of the Plan Committee Agreement, the Creditors Committee's representative will likely be off the Plan Committee within a few weeks of the Effective Date, as that member is required to resign from the Committee without any replacement or successor as soon as the allowed claims of unsecured creditors have been paid in full or a reserve has been provided for the disputed claims. Accordingly, there will be only two members on the Plan Committee, and the Debtor's representative will almost certainly oppose any and all actions to be taken against the Insiders.

received. It would then fall to the Plan Committee to object to the proposed settlement. All of this expense and uncertainty would best be avoided if the Equity Committee, rather than the Debtor (i.e., the Insiders), was permitted to name the Plan Administrator.

33.     In short, this Court should not permit the Insiders to insulate themselves from possible claims at the expense of shareholders by naming the Plan Administrator who will be charged with investigating – and potentially bringing - all claims against those same persons.

> **C.     If the Court Permits the Debtor to Name the Plan Administrator, the Debtor Should Not Have any Role on the Plan Committee.**

34.     The Plan Committee was intended as a check and balance upon the Plan Administrator. In the event that the Court permits the Equity Committee to name the Plan Administrator, then no Plan Committee is necessary. However, if the Court permits the Insiders to name the person charged with investigating and possibly bringing all claims against the Insiders, then clearly the Debtor should have absolutely no role in selecting the only party charged with oversight of the Plan Administrator.

35.     Further, any argument that the Plan Administrator's actions or inactions would be subject to the ability of the Plan Committee to object is exaggerated when you consider that the member appointed by the Creditors' Committee will be forced to resign shortly after the Effective Date, leaving a deadlock between the two remaining Plan Committee members. And while Section 2.5 of the Plan Committee Agreement provides that a member with a conflict shall be excluded from voting on the matter, there may be issues in which the Debtor's appointee to the Plan Committee will not personally have an interest, but will have a relationship with the person who is to be adversely affected.

36.     Again, for example, if the Debtor's proposed Plan Administrator is appointed, and the Equity Committee nominee is dissatisfied with the Plan Administrator's investigation and failure to bring an action for any unreleased claims, the Plan Committee would need to file a motion to require that the Plan Administrator bring an action against certain of the Insiders (which may or may not include the Debtor's appointee to the Plan Committee). First, assuming that the Debtor's appointee was the subject of a claim, under the terms of the Plan Committee agreement, he would be entitled to review the potential claims in order to determine that he has a conflict and cannot vote. Second, even if the Debtor's appointee was not the subject of a claim, it is hardly credible to believe that the Debtor's appointee would vote to bring a claim against someone with whom he worked and has a relationship. Under that scenario, the Plan Committee would be deadlocked.

**D.    The requirement in Section 6.13 of the Plan that the Plan Administrator reserve $500,000 for the Insiders' indemnification claims set forth Should be Stricken.**

37.     In another example of how the Insiders seek special treatment under the Plan, Section 6.13 of the Plan creates a dichotomy between the Insiders' contingent, unliquidated indemnification claims and all other contingent, unliquidated claims. In the first two sentences, it requires that the Plan Administrator seek the estimation for purposes of distribution of contingent or unliquidated claims filed against the Debtor. Only upon determination of the estimated amount of such contingent or unliquidated claim, the Plan Administrator must maintain cash in the amount of such estimated claims in a reserve account until such claims are resolved in full or in part, either by agreement or Order of the Court. On the other hand, the Plan presumes the validity of the Insiders' claim for indemnity and therefore requires that the Plan Administrator maintain cash in a reserve account on account of the Insiders' claims for

2892458/1

indemnity in an amount equal to the aggregate deductible payment(s) for the Debtor's applicable insurance policies (which is equal to $500,000). There is no basis for the disparate treatment among similarly situated creditors other than the fact that the Insiders have propounded the terms of the Plan.

38.     In addition to the fact that Section 6.13 proposes to treat similarly situated claims differently,[8] there is also the issue that the Debtor is attempting to use the confirmation hearing as a de facto 502(c) evidentiary hearing and then seeks to establish a reserve that is equal to the highest amount that the Insiders could possibly receive on account of their indemnity claims.

39.     Finally, there is no temporal requirement for the release of the $500,000 reserve. Accordingly, the Insiders could, in theory, require that the Plan Administrator maintain thee reserve for the Insiders' contingent, unliquidated indemnification claims until at least six years after the Effective Date.

40.     Simply stated, Section 502(c) of the Bankruptcy Code provides the mechanism for the estimation of contingent, unliquidated claims. The Plan Administrator should treat the Insiders' contingent, unliquidated indemnification claims like all other contingent, unliquidated indemnification claims and file a motion for estimation and keep a reserve for the amount of the estimated claim.

## CONCLUSION

41.     At its root, the proposed releases, the Debtor's naming of the Plan Administrator, the Debtor's representative of one person on the Plan Committee, and the $500,000 reserve all go back to a central theme that started on the first day of the case: at almost every conceivable turn, the Debtor has run this case for the benefit of the Insiders, rather than creditors and

---

[8]     In the Second Omnibus Objection to Claims filed by the Debtor, it objected to claim number 48 filed by the U.S. Customs and Border Protection because the claim "consists of an unliquidated amount for contingencies arising out of the Debtor's shipment of product that have not yet arisen post-petition." [Docket No. 421, Ex. B].

2892458/1

shareholders. First, the Debtor sought authority for a management incentive plan which guaranteed that the Debtor's management employees alone would receive an aggregate of more than $300,000 just by remaining with the Debtor until after the sale of substantially all of its assets.[9] The Debtor has spent almost $586,000 of estate assets to protect the Insiders by the purchase of the six-year tail for insurance, some of which is for a period long after the Debtor has conceded that the case will be fully administered and closed.

42.     Now, in its final act, the Debtor has unilaterally sought to permanently insulate the Debtor's Insiders by (i) giving releases for all prepetition and postpetition acts and omissions other than those determined by a Final Order to have constituted willful misconduct or gross negligence; (ii) appointing the only party with standing to bring any actions against the Insiders; and (iii) virtually guaranteeing a deadlock over the only party with authority to supervise the Plan Administrator. Further, the Debtor seeks to require that the Plan Administrator maintain a $500,000 reserve for the contingent, unliquidated claims of its directors and officers. In short, it is hard to envision any manner or means in which the Debtor could seek to more favorably treat the Insiders than it has throughout this case.

43.     As more fully set forth hereinabove, as a matter of Third Circuit law, the Court cannot permit the Releases requested by the Debtor. Similarly, the integrity of the bankruptcy process requires that the Court permit the Equity Committee to name the Plan Administrator. In that case, there is no need for any Plan Committee. If, on the other hand, the Court permits the Debtor to name the Plan Administrator, the very least that the Court should do is remove the Debtor's appointment to the Plan Committee and permit the Equity Committee to name two (2)

---

[9]     It is worthy of note that the Insiders remain so committed to their own interests that they included the following provision in Section 6.5 of the Plan: "Notwithstanding anything to the contrary, prior to making any Distributions to Holders of Interests, the Plan Administrator shall first reserve for amounts due under, or which may be due under, the MEIP."

members to the Plan Committee. Finally, the Court should eliminate the requirement that the Plan Administrator reserve $500,000 for the Insiders' directors and officers indemnification claims set forth in Section 6.13 of the Plan.

WHEREFORE, the Equity Committee respectfully requests that the Court (i) confirm the Plan except: (a) Section 9.5 should be revised to provide releases to the Insiders only for postpetition claims related to an act or omission which were not the result of either willful misconduct or gross negligence, (b) permit the Equity Committee to name the Plan Administrator; (c) either eliminate all Plan Provisions which include a Plan Committee or permit the Equity Committee to nominate all of the members of the Plan Committee, other than the Creditors Committee nominee who will resign shortly after confirmation, and (d) eliminate the requirement that the Plan Administrator reserve $500,000 for the Insiders' directors and officers indemnification claims set forth in Section 6.13 of the Plan; and (ii) grant to the Equity

*[Remainder of Page Left Intentionally Blank]*

2892458/1

Committee such other and further relief as is just and proper.

December 6, 2010

MORRIS JAMES LLP

Jeffrey R. Waxman (No. 4159)
Courtney R. Hamilton (No. 5432)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750

-and-

P. David Carlebach, Esq.
Law Offices of David Carlebach, Esq.
40 Exchange Place, Suite 1306
New York, New York 10005
Tel: (212) 785-3041
Fax: (212) 785-3618

*Counsel to the Official Committee*
*of Equity Security Holders*

2892458/1